

FILED IN CLERK'S OFFICE
U S D C  Atlanta

JUL 1 4 2008

JAMES N HATTEN, Clerk
By, _____ Deputy Clerk

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF GEORGIA**
**ATLANTA DIVISION**

UNITED STATES OF AMERICA, *ex rel.*    )
MELISSA SIMMS POWELL, ANGELA    )
HITCHENS, JOSEPH P. PLUMLEY, JR.,    )
ED.D., and GLENN W. DOBSON    )
    )
    Plaintiffs,    )
    )
v.    )
    )
AMERICAN INTERCONTINENTAL    )
UNIVERSITY, INC., a Georgia    )
Corporation, CAREER EDUCATION,    )
CORP., a Delaware Corporation and    )
JOHN DOE NOS. 1-100,    )
    )
    Defendants.    )

Civil Case No:

**1-08-CV-2277-GET**

*(FILED IN CAMERA AND*
*UNDER SEAL PURSUANT*
*TO THE FALSE CLAIMS ACT,*
*31 U.S.C. §§ 3729, et seq.)*

**COMPLAINT**

    Plaintiffs and Relators Melissa Simms Powell, Angela Hitchens, Joseph P.

Plumley, Jr. Ed.D., and Glenn W. Dobson ("Relators") acting for themselves and

on behalf of the United States of America allege as follows:

**I.    INTRODUCTION**

    1.    This is an action to recover damages and civil penalties on behalf of

the United States of America arising out of false claims presented by American

InterContinental University, Inc., and Career Education, Corp., and other unknown

persons (collectively referred to herein as "Defendants"). Defendants obtained and

1

continue to obtain millions of dollars annually from the United States Department

of Education ("DOE") pursuant to the Higher Education Act, Title IV ("HEA")

from at least January 1, 2001, continually through the present. In obtaining such

funds, Defendants falsely represented and continue to represent every year that

they are in compliance with the HEA's prohibition against incentive-based

compensation for enrollment counselors and that they are in compliance with the

requisite accreditation standards. Defendants had, and continue to have, actual

knowledge that they are not in compliance with the HEA's incentive-compensation

ban and that their representations of compliance are false and fraudulent.

Similarly, Defendants had and continue to have actual knowledge that they are not

in compliance with required accreditation standards and that their representations

of compliance are false and fraudulent. Alternatively, Defendants act and acted

with deliberate indifference and/or reckless disregard as to the truth or falsity of

such representations of compliance with the HEA and the accreditation standards.

Relator assert causes of action under the False Claims Act, 31 U.S.C. §§

3729(a)(1) and (2).

## II.   JURISDICTION AND VENUE

2.     This action is brought pursuant to the False Claims Act, 31 U.S.C. §§

3729, *et seq.*, and subject matter jurisdiction is invoked pursuant to 29 U.S.C. §

1331. This case arises from the wrongful conduct of Defendants in obtaining funds from the DOE, pursuant to the HEA, to which they were not entitled.

3.    This Court has *in personam* jurisdiction over the Defendants under 31 U.S.C. § 3732(a), which authorizes nationwide service of process. The False Claims Act provides that "[a]ny action under section 3730 may be brought in any judicial district in which the Defendant or, in the case of multiple Defendants, any one Defendant, can be found, resides, transacts business, or in which any proscribed by section 3729 occurred." 31 U.S.C. § 3732(a). Venue is proper in the Northern District of Georgia because Defendants maintain and operate their Buckhead and Dunwoody campuses, in addition to their Central Administrative offices, within this District.

## III.    PLAINTIFFS

4.    Relator Melissa Simms Powell ("Ms. Powell"), at all material times, is a citizen of the United States of America and is a resident of the State of Georgia. Ms. Powell worked for Defendant American Intercontinental University, Inc. ("AIU") from 2002 through February 19, 2008 as an Academic Advisor at AIU's Dunwoody campus. Ms. Powell brings this action on behalf of the United States of America.

5.     Relator Angela Hitchens ("Ms. Hitchens"), at all material times, is a citizen of the United States of America and is a resident of the State of Georgia. Ms. Hitchens currently works in the Registrar's office at AIU's Dunwoody campus. Ms. Hitchens brings this action on behalf of the United States of America.

6.     Relator Joseph P. Plumley, Jr. Ed.D. (Mr. Plumley), at all material times, is a citizen of the United States of America and is a resident of the State of Georgia.  Mr. Plumley worked for Defendant AIU from March 27, 2006 through February 19, 2008 and served as the Vice President for Academic Affairs and acting President at AIU's Dunwoody campus.  Mr. Plumley also held the additional title of Vice President for Campus Operations from May 2007 through January 2008.  Mr. Plumley brings this action on behalf of the United States of America.

7.     Relator Glenn W. Dobson ("Mr. Dobson"), at all material times, is a citizen of the United States of America and is a resident of the State of Georgia. Mr. Dobson worked for Defendant AIU from January 6, 2006 through February 19, 2008 as the Director of Human Resources at AIU's Dunwoody campus.  Mr. Dobson brings this action on behalf of the United States of America.

8.      As required under the False Claims Act, 31 U.S.C. § 3730(b)(2),

Relators served the Office of the Inspector General of the DOE, the United States

Attorney General, and the United States' Attorney's Office for the Northern

District of Georgia, pursuant to Rule 4(i) of the Federal Rules of Civil Procedure,

with a copy of the complaint and a written disclosure of substantially all material

evidence and information in the Relators' possession. This disclosure statement

supports the existence of the "submission of a knowingly false or fraudulent claim

for payment or approval" under the False Claims Act. 31 U.S.C. § 3729(a)(1).

9.      Relators meet the statutory definition of "original source." *See* 31

U.S.C. § 3730(e)(4)(B). Relators have direct, independent, and first-hand

knowledge of the information on which the allegations of fraudulent misconduct

are based. Relators further voluntarily provided such information to the Office of

the Inspector General of the DOE and the United States Attorney General at least

thirty days before filing this Complaint.

10.      The United States of America is a named plaintiff because funds of

the United States of America, were and are awarded to Defendants, pursuant to the

HEA programs, including the Federal Pell Grant Program ("Pell"), the Federal

Family Education Loan Program ("FFELP"), the Federal Supplemental

Educational Opportunity Grant Program ("FSEOG"), and the Federal Perkins Loan

Program ("Perkins") (collectively referred to herein as "Federal Funds"), as a result of the false claims alleged in this Complaint. Further, Defendants' false or fraudulent claims caused the United States to make payments to third party lenders, which the United States would not have made but for Defendants' false or fraudulent course of conduct.

## IV.    **DEFENDANTS**

11.    Defendant AIU was founded in 1970 as a for-profit higher education institution providing educational programs. AIU maintains two campuses in Fulton County, Georgia. AIU has five campuses nationwide, which each have approximately 1200 full-time students, in addition to an online program. AIU was acquired by Defendant Career Education Corporation ("CEC") in 2001. Since Defendant CEC acquired Defendant AIU, its "cohort default rate" for federal loans has doubled.

12.    Defendant AIU is accredited by the Southern Association of Colleges and Schools ("SACS"). Through its online program and its campuses, Defendant AIU offers associate, undergraduate, and graduate degree programs.

13.    Defendant Career Education Corp. ("CEC") is a Delaware corporation that does business in Fulton County, Georgia by and through Defendant AIU, its wholly owned and controlled subsidiary. Relators are informed and believe that

CEC exercises complete dominion and control over each and all of its subsidiaries, including Defendant AIU, and enjoys the full benefit of all monies and profits earned by these subsidiaries. Relators are also informed and believe that CEC benefits in other direct and indirect ways from and prescribes all of the wrongful actions of Defendant AIU alleged in this Complaint and, as a consequence, is in possession of monies rightfully belonging to the United States of America.

14.    As set forth herein, Plaintiffs are informed and believe that Defendant CEC develops and oversees the implementation of all policies and procedures at Defendant AIU, including without limitation policies and procedures concerning admissions practices, financial aid practices, curriculum, and job placement. Defendant AIU then implements and carries out the policies and procedures developed and imposed by Defendant CEC. Throughout all their activities, Defendant CEC and Defendant AIU acted as alter egos of each other.

15.    Each of DOES 1-100 is the agent, servant, partner, joint-venturer, co-venturer, principal, director, officer, manager, employee, or shareholder of one or more of its co-defendants who aided, abetted, controlled, and directed or conspired with and acted in furtherance of said conspiracy with one or more of its co-defendants in said codefendant(s) performance of the acts and omissions described below and for the fraudulent purposes described below. Plaintiffs sue each of

these DOE Defendants by these fictitious names because Plaintiffs do not now know these Defendants' true names and capacities.

16.    At all relevant times, each Defendant was the authorized agent of each other Defendant.  The terms "Defendants" will refer collectively to the aforesaid Defendants acting by and through their managerial employees, and each of them.

## V.    SACS OVERSIGHT OF AIU

17.    In the United States, the DOE delegates accreditation enforcement responsibilities to regional accreditation agencies, one of which is SACS.  *See* 34 CFR §§ 602.10, 602.11, 602.19, 602.20, 668.8, 668.9, 668.85, and 668.86.

18.    SACS is one of six regional associations that accredit public, private, and for-profit schools, colleges, and universities in the United States.  The Southern region covers institutions in Virginia, Kentucky, North Carolina, Tennessee, South Carolina, Georgia, Alabama, Mississippi, Louisiana, Texas, and Florida.

19.    The SACS accreditation process aids institutions in developing and sustaining effective educational programs and assures the DOE, the educational community, the general public, and other organizations that an accredited institution has met high standards of quality and effectiveness.

20.    The DOE delegates to SACS the responsibility of ensuring that colleges and universities are in compliance with DOE's minimum accreditation standards.

## VI.    FALSE CLAIMS AND FRAUDULENT STATEMENTS

### A.    Fraudulent Conduct related to Defendants' Failure to Comply with the Incentive Compensation Ban

21.    The HEA, Title IV, prohibits colleges and universities from providing "any commission, bonus, or other incentive payment based directly or indirectly on success in securing enrollments or financial aid to any persons or entities engaged in any student recruiting . . ." to enrollment counselors based on their recruiting activities.  28 U.S.C. § 1094(a)(20).  Congress enacted the incentive compensation ban in 1992 amid reports that institutions of higher education were enrolling unqualified students, just to obtain Federal Funds in the form of student loans and grants.

22.    Defendants, in flagrant and knowing violation of the incentive compensation ban, compensates enrollment counselors based directly on their recruiting activities (enrollments, telephone calls, generation of leads, appointments, etc.).  Enrollment counselors at Defendant AIU must meet certain "quotas" regarding the number of students they enroll at AIU.  On information and belief, the top ranking enrollment counselors, i.e. the enrollment counselors with

the highest number of enrollments, are among the highest paid, receiving the highest salary in addition to incentive trips, awards, and gifts based on their enrollment numbers.

23.     In January 2008, Defendants sent its top-performing enrollment counselors from its Buckhead and Dunwoody campuses on all an all expense paid trip to Miami, Florida.

24.     To boost enrollment numbers, Defendants urge enrollment counselors to enroll students without reviewing their academic qualifications.  In fact, some students were admitted to AIU who could not read.

25.     In addition, enrollment counselors frequently enroll students without having their "proof of graduation" on file.  It is AIU's policy that a student must have a proof of graduation on file within 30 days of starting school.  However, it is common for a student to go beyond the 30 days without having a proof of graduation on file.

26.     Federal law requires that students have a high-school diploma or its equivalent, or pass a federally approved test showing that they have an "ability to benefit" from a college education before being eligible to obtain Federal Funds. *See* 28 U.S.C. 1091(d).

27.    In fact, when Ms. Powell conducted degree audits, she pulled graduation forms where students had completed all of their coursework and still did not have a proof of graduation on file.

28.    Students without a proof of graduation on file were routinely admitted to AIU and, on information and belief, deemed eligible for receipt of Federal Funds by Defendants.

29.    At least one student without a proof of graduation on file graduated and obtained a degree from Defendant AIU.

30.    The admission of unqualified students leads to student disqualification from AIU (or to additional financial costs for the students to take additional remedial classes) and financial disaster for the students who are forced to attempt to repay loans for an education from which they are unable to benefit.  All the while, Defendant AIU collects Federal Funds for these fraudulently "enrolled" students.

31.    Defendants place enrollment counselors who fail to reach acceptable enrollment activity levels on "warning" and set forth a minimum enrollment activity goal.  If an enrollment counselor is unable to meet such a minimum enrollment activity goal, that enrollment counselor is fired.

32.     Defendants are fully aware of the illegality of their compensation scheme.

**B.     Fraudulent Conduct related to SACS Accreditation**

33.     The DOE recognizes accreditation by the SACS Commission on Colleges in establishing the eligibility of higher education institutions to participate in programs authorized under the HEA. The HEA mandates that SACS review an institution in accordance with the criteria outlined in the regulations developed by the DOE. As a condition for Defendant AIU to participate in the federal student tuition assistance programs and to receive Federal Funds, AIU must be accredited by SACS.

34.     In 2005, Defendant AIU was put on warning that its policies as an academic institution did not meet the SACS accreditation standards. During the warning period, SACS sent Defendant AIU recommendations on how to improve its performance; however, Defendant AIU took few if any corrective measures and changed few if any of its policies.

35.     Defendant AIU's failure to take adequate corrective action caused SACS to place Defendant AIU on probation in 2006 and again in 2007. SACS identified eighteen areas in which Defendant AIU needed to take corrective action

in order to retain its accreditation.  In December 2007, Defendant AIU regained its full accredited status.

36.    Two chief areas of concern for SACS were: (a) Defendant AIU's compliance with the incentive compensation ban and (b) the terminal degrees, or lack thereof, of Defendant AIU's faculty.

37.    SACS requires that "[t]he institution [be] in compliance with its program responsibilities under Title IV of the 1998 Higher Education Amendments," including the incentive compensation ban. *See* Ex. A, § 4.7, pg 36.

38.    One of Defendant AIU's impediments to accreditation was its enrollment counselors' focus on "sales" instead of "service."  Prior to probation, enrollment counselors were given little, if any, admissions criteria regarding the students.  During the probation period, the enrollment counselors were retrained. SACS provided Defendant AIU with an IDM (Interest, Desire, Motivation) checklist for the admissions department to utilize during student interviews to determine a student's academic qualifications and his or her ability to benefit from a collegiate education.

39.    SACS also requires that "[a]t least 25 percent of the discipline course hours in each major at the baccalaureate level are taught by faculty members holding the terminal degree – usually the earned doctorate – in the discipline, or

the equivalent of the terminal degree." The Principles of Accreditation, Southern Association of Colleges and Schools Commission on Colleges, § 3.5.4, pg. 27. A true and correct copy of The Principles of Accreditation is attached hereto as Exhibit A.

40.    Defendants were aware that if SACS did not remove Defendant AIU from probation in 2007, Defendant AIU would lose its accreditation and its right to Federal Funds for its students. Defendant AIU thus informed SACS that it would make the required changes, including utilizing the IDM checklists as part of admission, and retaining the required level of qualified faculty. When Defendant AIU made these representations to SACS, it knew they were false and Defendant AIU had no present intent to institute the changes recommended by SACS.

41.    Defendants actively deceived SACS regarding their admissions policies and procedures during the accreditation process. The week before SACS visited the AIU Buckhead campus, Mr. Dobson was instructed to remove documents from the files of enrollment counselors with any mention or write up tied to quotas. He also removed documents mentioning the threat of termination for enrollment counselors who failed to meet their quotas.

42.    Under direct orders, Mr. Dobson went through all the enrollment counselors' employee files, removed the incriminating documents, and placed

them in a locked file cabinet, which would be off-limits to SACS. Further, large boards tracking the progress of admissions employees in meeting their quotas were removed from the areas to be inspected by SACS. These materials were not destroyed, and were put back into use after SACS personnel left the premises. In addition, resumes and background materials of enrollment counselors are routinely "cleaned" to remove any mention of their background in sales or their ability to meet aggressive marketing quotas.

43.    True to its plan, after receiving its accreditation, Defendant AIU hired a new director of admissions in January of 2008. The new director of admissions directed the enrollment counselors to cease utilizing the IDM checklist in Defendant AIU's admissions process and immediately placed AIU enrollment counselors on warning because their enrollment numbers were too low.

44.    Under threat of termination, Defendant AIU enrollment counselors ceased "counseling" students when they ceased utilizing the IDM checklist approved by SACS. These counseling measures are fundamental to protecting prospective students, but take time away from an enrollment counselors' primary goal of increasing the sheer number of students enrolled at AIU.

45.    In January of 2008, Defendant AIU began utilizing the same or a substantially similar quota system that it had in place prior to its SACS probation.

Defendants instructed AIU's enrollment counselors that the number one priority is the quantity – not the quality – of the students they are able to attract to AIU.

46.    When AIU regained its accreditation in December 2007, it barely met the "25% Rule" regarding the terminal degrees of its faculty. Immediately after regaining its accreditation, AIU fired a large percentage of its faculty in January of 2008, many of whom held terminal degrees. Further, in February of 2008, AIU-Dunwoody fired twenty-seven employees, many of whom held terminal degrees. This lay-off included every member of AIU Dunwoody's executive team (except Michael Betz, the Vice President of Admissions).

## VII.   **DEFENDANT AIU's FALSE CERTIFICATIONS OF COMPLIANCE TO THE GOVERNMENT**

### A.    **AIU's False Certifications of Compliance with the Incentive Compensation Ban**

47.    Institutions receive HEA funds for eligible students through several programs, including the Federal Pell Grant Program ("Pell"), the Federal Family Education Loan Program ("FFELP"), the Federal Supplemental Educational Opportunity Grant Program ("FSEOG"), and the Federal Perkins Loan Program ("Perkins") (collectively referred to herein as "Federal Funds").

48.    Federal Funds granted under the HEA require layers of paperwork. In order to receive such Federal Funds, the institution must first submit an application

to establish its eligibility. In this application, the institution must agree to abide by many different statutes and regulations. If the DOE grants the institution's application, the institution enters into a Program Participation Agreement ("PPA") with the DOE and its students may apply to the institution for Federal Funds. *See* 28 U.S.C. §§ 1094(a) and (a)(20); 34 C.F.R. § 668.14(a)(1) and (b)(22). If the institution finds the student eligible, the institution presents a request for Federal Funds to the DOE.

49.    Federal law requires that students have a high-school diploma or its equivalent, or pass a federally approved test showing that they have an "ability to benefit" from a college education before being eligible to obtain Federal Funds. *See* 28 U.S.C. 1091(d). On information and belief, Defendants falsely certified that students were eligible for Federal Funds without requiring proof of a high-school diploma or its equivalent, or a passing score on a federally approved test showing that such students have an "ability to benefit" from an AIU education.

50.    The PPA conditions the initial and continued participation of an eligible institution in any HEA, Title IV program. The PPA expressly states in bold print, highlighted in a box on the first page that "[t]he execution of this Agreement by the Institution and the Secretary is a prerequisite to the Institution's initial or continued participation in any Title IV, HEA Program." A true and

correct copy of the current PPA entered into between Defendant AIU and the DOE
is attached hereto as Exhibit B.

51.    The Agreement's first paragraph furthermore provides that the
institution's participation in the Title IV, HEA program is "subject to the terms and
conditions of this Agreement." *See* Ex. B, ¶ 1, p. 1.

52.    The incentive compensation ban is expressly included in the "terms
and conditions" of the PPA.  In Paragraph 22, an institution must expressly
promise that "[i]t will not provide . . . any commission, bonus, or other incentive
payment based directly or indirectly on success in securing enrollments . . . ." *See*
Ex. B, ¶ 22, pg. 5 (*quoting* 28 U.S.C. § 1094(a)(20) and 34 C.F.R. §
668.14(b)(22)).  This contractual promise is integral to the causal chain leading to
payment from the Government.

53.    Defendant AIU, in receiving millions of dollars a year in Federal
Funds, falsely certifies to the DOE that it is in compliance with the incentive
compensation ban when it presents a request for Federal Funds to the DOE or a
private lender.  Defendant AIU falsely induces the Government to approve and/or
pay Federal Funds based on its false promises to comply with the incentive
compensation ban.  The promises are false when made.  At the time that Defendant
AIU promises and/or certifies its compliance with the incentive compensation ban,

Defendant AIU is engaging in the illegal incentive compensation schemes detailed above.

54.     In the case of FFELP loans specifically, the DOE subsidizes the interest payments during the period that the student is enrolled in classes and during certain specified deferral periods. Defendant AIU falsely induces the Government to approve and/or pay these interest subsidies to private lenders, including, upon information and belief, lenders affiliated with Defendant CEC, based on its false promises to comply with the incentive compensation ban. But for the false promises of compliance, the government would not pay these interest subsidies. The promises are false when made. At the time that Defendant AIU promises and/or certifies its compliance with the incentive compensation ban, Defendant AIU is engaging in the illegal incentive compensation schemes detailed above.

55.     If the student fails to repay the FFELP loans, the guaranteeing agency reimburses the private lender for the balance of the federal loan and tries to collect the unpaid amount. If the reinsurance agency is unsuccessful in its collection attempts, the DOE reimburses the guaranteeing agency for the loss or accepts assignment of the FFELP loan. Defendant AIU falsely induces the Government to approve and/or pay the guaranteeing agencies for these defaulted loans based on its

false promises to comply with the incentive compensation ban. But for the false promises of compliance, the government would not pay the guaranteeing agencies for the defaulted federal loans. The promises are false when made. At the time that Defendant AIU promises and/or certifies its compliance with the incentive compensation ban, Defendant AIU is engaging in the illegal incentive compensation schemes detailed above.

56.    The default rate of AIU students on federal loans has steadily increased since Defendant CEC assumed ownership in 2001. In 2001, the AIU cohort default rate was 5.4% (on par with the national average). In 2005, the AIU cohort default rate skyrocketed to 10.1%, almost double the national average.

57.    Defendants knowingly and intentionally deceive the DOE regarding Defendant AIU's violations of the HEA ban on incentive compensation for enrollment counselors. Defendant AIU makes it very clear to all of its enrollment counselors that their number one priority is to enroll students and they are compensated or terminated accordingly.

**B.    Defendant AIU's False Certifications of Compliance to SACS**

58.    Based on information and belief, Defendant AIU, by and through its President, falsely certified its compliance with the standards outlined in the SACS Principles of Accreditation, including but not limited to AIU's compliance with the incentive compensation ban and that 25% of Defendant AIU's faculty held the requisite terminal degrees. When Defendant AIU made such certifications of compliance, Defendant AIU concealed from SACS its present intention not to comply with SACS Principles of Accreditation going forward. But for such false representations to SACS, Defendant AIU would not have obtained nor retained its SACS accreditation.

59.    In its Fourth Quarter Earnings Call, conducted on February 21, 2008, Defendant CEC admits that "AIU has many initiatives under way to improve its profitability . . . initiatives [that] were prohibited over the past two years while AIU was on probation." *See* Career Education Q4 2007 Earnings Call Transcript, pg. 13. A true and correct copy of the Career Education Q4 2007 Earnings Call Transcript is attached hereto as Exhibit C. CEC was "able to achieve [a] 12% start improvement while reducing [its] cost per start by nearly 17%." Ex. C, pg. 3.

60.    For an institution to be eligible to receive Federal Funds, the federal statutes and regulations require the institution to certify to the government in the

PPA that the institution will comply with a number of regulations and requirements, including that Defendant AIU meets the requirements established by a nationally recognized accrediting agency. *See* 28 U.S.C. §§ 1094(a)(21); 34 C.F.R. § 668.14(a)(1) and (b)(22).

61.     Without a signed PPA containing these promises and certifications, Defendant AIU could not apply for or receive Federal Funds for tuition.  By signing the PPA, Defendant AIU false certified its compliance with the SACS accreditation requirements to the DOE.

## COUNT I – DEFENDANTS KNOWINGLY MADE FALSE STATEMENTS TO OBTAIN A FALSE OR FRAUDULENT CLAIM PAID OR APPROVED IN VIOLATION OF THE FALSE CLAIMS ACT, 31 U.S.C. § 3729(a)(1)

62.     Plaintiffs hereby incorporate the allegations contained in the foregoing paragraphs of the Complaint as if fully set forth herein.

63.     In performing all of the acts described herein, Defendants, via express and implied certifications, submitted false claims to the United States of America.

64.     Defendants either knowingly or with deliberate ignorance or reckless disregard of the truth or falsity of the claim presented or caused to be presented, to one or more officers, employees, or agents of the United States of America, false and fraudulent claims for payment or approval in contravention of the False Claims Act, 31 U.S.C. § 3729(a)(1).

65.    Such false or fraudulent claims caused damage to the Treasury of the United States of America. Because of Defendants' false and fraudulent claims, the United States paid Federal Funds to Defendants to which Defendants are not entitled. Further, Defendants' false or fraudulent claims caused the United States to make payments to third party lenders, which the United States would not have made but for Defendants' false or fraudulent course of conduct.

66.    Relators estimate that, as a proximate result of Defendants' conduct described herein, the amount of damages sustained by the United States of America is in the millions of dollars.

## COUNT II – DEFENDANTS KNOWINGLY USED FALSE RECORDS OR FALSE STATEMENTS TO OBTAIN A FALSE OR FRAUDULENT CLAIM PAID OR APPROVED IN VIOLATION OF THE FALSE CLAIMS ACT, 31 U.S.C. § 3729(a)(2)

67.    Plaintiffs hereby incorporate the allegations contained in the foregoing paragraphs of the Complaint as if fully set forth herein.

68.    In performing all of the acts described herein, Defendants, via express and implied certifications, knowingly made, used, or caused to be made or used, a false record or statement to get a false and fraudulent claim for payment or approval in contravention of the False Claims Act, 31 U.S.C. § 3729(a)(2).

69.    Alternatively, Defendants, via express and implied certifications, with deliberate ignorance or reckless disregard of the truth or falsity of the claim made,

used, or caused to be made or used, a false record or statement to get a false and fraudulent claim for payment or approval in contravention of the False Claims Act, 31 U.S.C. § 3729(a)(2).

70.    Such false or fraudulent claims caused damage to the Treasury of the United States of America.   Because of Defendants' false and fraudulent claims, the United States paid Federal Funds to Defendants to which Defendants are not entitled.  Further, Defendants' false or fraudulent claims caused the United States to make payments to third party lenders, which the United States would not have made but for Defendants' false or fraudulent course of conduct.

71.    Relators estimate that, as a proximate result of Defendants' conduct described herein, the amount of damages sustained by the United States of America is in the millions of dollars.

## COUNT III – PROMISSORY FRAUD

72.    Plaintiffs hereby incorporate the allegations contained in the foregoing paragraphs of the Complaint as if fully set forth herein.

73.    In performing all of the acts described herein, Defendants made a false promise, with knowledge of its falsity and without the intent to perform, with the intent to defraud officers, employees, or agents of the United States of

America, who justifiably relied on such promise to the damage of the Treasury of the United States of America.

74.    Relators estimate that, as a proximate result of Defendants' conduct described herein, the amount of damages sustained by the United States of America is in the millions of dollars.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs request the following relief:

1.    Judgment in favor of the United States of America against Defendants, jointly and severally, by reason of the violation of the False Claims Act as set forth fully above, in an amount equal to three times the amount of damages the United States has sustained because of Defendants' actions;

2.    A civil penalty in favor of the United States of America against Defendants, jointly and severally, by reason of the violation of the False Claims Act as set forth fully above, in an amount equal to not less than Five Thousand Dollars ($5,000.00) and not more than Ten Thousand Dollars ($10,000.00) for each false claim that Defendants presented to the United States of America;

3.    Award to Relators of the maximum amount allowed pursuant to 31 U.S.C. § 3730(d) of the False Claims Act on the United States of America's recovery;

4.    Award to Relators of all reasonable expenses that the Court finds to have been necessarily incurred, plus reasonable attorneys' fees and costs; and

5.    Other such further relief as the Court deems just and proper.

PLAINTIFFS DEMAND A TRIAL BY JURY.

This 14th day of July, 2008.

Joseph D. Wargo
Georgia Bar No. 738764
jwargo@wargofrench.com
David M. Pernini
Georgia Bar No. 572399
dpernini@wargofrench.com
Sarah-Nell H. Walsh
Georgia Bar No. 141240
swalsh@wargofrench.com
WARGO & FRENCH LLP
1170 Peachtree Street, NE
Suite 2020
Atlanta, GA  30309
(404) 853-1500 (telephone)
(404) 853-1501 (facsimile)
*Attorneys for Plaintiffs*