**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF GEORGIA**
**ATLANTA DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | |
| *ex rel.*, MELISSA SIMS | : | |
| POWELL, *et al.*, | : | |
| | : | |
|     Plaintiffs, | : | CIVIL ACTION NO. |
| | : | 1:08-CV-2277-RWS |
| v. | : | |
| | : | |
| AMERICAN | : | |
| INTERCONTINENTAL | : | |
| UNIVERSITY, INC., *et al.*, | : | |
| | : | |
|     Defendants. | : | |

**<u>ORDER</u>**

This case comes before the Court on Defendants' Motion to Dismiss for Lack of Subject Matter Jurisdiction [124, 146], Defendants' Motion for Partial Summary Judgment [115], and Defendants' Motion for Leave to File Amended Statement of Material Facts [145, 147]. After a review of the record, the Court issues the following order.

**I. Factual Summary[1]**

American InterContinental University ("AIU") is a for-profit accredited

---

[1]Unless otherwise stated, the following facts are drawn from the Complaint. Any facts which are relevant to the Defendants' Motion for Partial Summary Judgment will be stated separately in that section's analysis.

institution of higher learning that provides undergraduate and graduate degree programs at five ground campuses worldwide as well as online. Defendant Career Education Corporation ("CEC") wholly owns AIU and "exercises complete dominion and control over each and all of its subsidiaries, including Defendant AIU."

Plaintiffs and Relators Melissa Simms Powell, Angela Hitchens, Joseph P. Plumley, Jr. Ed.D., and Glenn W. Dobson ("Relators") initiated this action pursuant to the False Claims Act, 31 U.S.C. § 3729, *et seq.* ("FCA") on behalf of the United States alleging fraud and abuse on the part of Defendants. Plaintiffs filed claims under the FCA to recover damages and civil penalties arising out of Defendants' alleged false claims for funding submitted to the United States Department of Education ("DOE") and false statements made by Defendants that were material to the submitted false claims. Specifically, Plaintiffs contend that Defendants made false statements concerning AIU's purported compliance with: (a) the Title IV of the Higher Education Act of 1965's prohibition against incentive-based compensation for enrollment counselors; (b) the Southern Association of Colleges and Schools' ("SACS")

2

accreditation standards; and (c) the student eligibility requirements of Title IV,

specifically the proof of graduation ("POG") requirement.

These false statements were allegedly made in the "Program Participation

Agreement" ("PPA") between Defendant AIU and the

DOE and in connection with each specific request for Pell Grant or Stafford

Loan funds made by Defendants to the DOE.  The PPA is a mandatory

agreement between the school and the DOE which "shall condition

the initial and continuing eligibility of the school to participate in a program

upon compliance with" specific statutory requirements. 20 U.S.C. § 1094(a).

Plaintiffs contend that the PPA submitted by AIU to the DOE on March 2, 2007

contains materially false statements regarding AIU's compliance with the

incentive compensation ban and the requirements imposed by SACS stated

above.  Plaintiffs argue that the false statements are a violation of the FCA

which prohibits the submission of a "false or fraudulent claim for payment or

approval" to the United States or the making of a "false record or statement

material to a false or fraudulent claim." 31 U.S.C. § 3729(a)(1)(A), (B).

Defendants now move to dismiss this action for lack of subject matter

jurisdiction, alleging that two of Relators' claims–the POG and incentive-based

3

compensation claims–are barred by the first-to-file and public disclosure bars.

Specifically, Defendants allege that four prior *qui tam* suits against CEC and one

prior *qui tam* suit against AIU Online preclude subject matter jurisdiction in this

case.

On April 30, 2004, the first *qui tam* suit was filed against Defendant CEC.

United States ex. rel. Tice v. Career Educ. Corp., (C.D. Cal. filed Apr. 30,

2004).[2] Relevent to this action, Tice alleged that "[i]n order to obtain hundreds

of millions for dollars in wrongful revenue from Title IV ineligible funds, CEC

has consistently and repeatedly lied to the Department of Education by falsely

certifying that it had the required Title IV documentation and proof of high

school graduation or its equivalent." Dkt. No. [124-6] at ¶ 6.

The next January, a second *qui tam* suit was filed against Defendant CEC.

United States ex. rel. Van Wingerden v. Career Educ. Corp., (C.D. Cal. filed Jan.

---

[2]The Court may take judicial notice of public records not attached to the Complaint, including in this case the prior *qui tam* complaints, when considering a motion to dismiss.  Bryant v. Avado Brands, Inc., 187 F.3d 1271, 1280 (11th Cir. 1998).  This does not convert the motion into one for summary judgment.  Universal Express, Inc. v. S.E.C., 177 F. App'x 52, 53 (11th Cir. 2006) ("A district court may take judicial notice of certain facts without converting a motion to dismiss into a motion for summary judgment. . . .  Public records are among the permissible facts that a district court may consider.") (citations omitted).

31, 2005). That complaint was filed by the former registrar of the CEC-owned

Brooks Institute of Photography ("Brooks") and a former auditor for ALMICH

Associates. <u>Van Wingerden</u> specifically focused on the activities at Brooks, but

alleged similar fraudulent activities to this suit–that Brooks failed to verify its

students' POG and that it employed incentive-based compensation for its

recruiters.

In August 2005, several former CEC employees, including Tami Hanson,

filed a *qui tam* suit against Defendant CEC and AIU Online. <u>United States ex.</u>

<u>rel. Hanson v. Career Educ. Corp.</u>, No. 05-CV-4444 (N.D. Ill. filed Aug. 3,

2005). There the relators claimed, *inter alia*, that the defendants had violated the

POG requirement and that they improperly used incentive-based compensation.

In September 2006, the final prior *qui tam* suit was filed. <u>United States ex.</u>

<u>rel. Dorin v. Career Educ. Corp.</u>, (M.D. Fla. filed Sept. 7, 2005). Relevant here,

this suit alleged that CEC "was falsifying records in order to qualify students by

. . . falsely representing that students had provided proof of high school

graduation." Dkt. No. [124-6] at ¶ 12.

Beyond their motion to dismiss, the Defendants have also moved for

summary judgment on all claims brought by relators Plumley, Dobson, and

Powell. They argue that because these relators signed releases prior to the filing of this lawsuit, they cannot bring any claims against them. Additionally, Defendants have moved to amend their statement of material facts to include evidence it previously attached to its motion to dismiss. The Court will consider each motion in turn.

## II. Motion to Dismiss for Lack of Subject Matter Jurisdiction

Defendants first move to dismiss two of Plaintiff's claims–the proof of graduation ("POG") claim and the incentive-based compensation claim[3]–arguing that they are barred by two False Claims Act jurisdictional provisions, the first-to-file bar and the public disclosure bar. Defendants move this Court to dismiss those claims for lack of subject matter jurisdiction pursuant to Rule 12(b)(1). However, Rule 12(b) states that a Rule 12(b)(1) motion must be filed "before pleading if a responsive pleading is allowed." FED. R. CIV. P. 12(b).  And, the Defendants have already filed a previous motion to dismiss and an answer. Therefore, under Rule 12(b), the Defendants' motion is untimely. See FED. R. CIV. P. 12(b).

---

[3]Defendants make clear that they are not moving to dismiss Relators' SACS accreditation claim. Dkt. No. [124-1] at 2.

However, while the motion may be untimely as a motion to dismiss, the defense raised is an appropriate one for a judgment on the pleadings. See FED. R. CIV. P. 12(c), (h)(3); Skrtich v. Thornton, 280 F.3d 1295, 1307 n.13 (11th Cir. 2002)  (noting that "a motion [to dismiss] *may* be construed as a request for judgment on the pleadings pursuant to [Rule] 12(c)") (emphasis in original); see also Dorsey v. Georgia Dept. of State Road and Tollway Authority SRTA, No. 1:09-CV-1182-TWT, 2009 WL 2477565, at *3 (N.D. Ga. Aug. 10, 2009) ("courts routinely construe a Rule 12(b)(1) or Rule 12(b)(6) motion filed after the close of pleadings as a Rule 12(c) motion for judgment on the pleadings."). Therefore, the Court construes Defendants' motion as a motion for judgment on the pleadings.

While the Court will operate under Rule 12(c), the Rule 12(b)(1) standards apply to this construed 12(c) motion.  See Dorsey, 2009 WL 2477565, at *3 n.1 (citing Wright & Miller, 5C FED. PRACT. & PROC. § 1367). Rule 12(b)(1) attacks on subject matter jurisdiction can come in two forms. "Facial attacks" require the court to evaluate the complaint to see whether the plaintiff has sufficiently alleged a basis for subject matter jurisdiction; the allegations are taken as true for purposes of the motion. Garcia v. Copenhaver, Bell & Assocs.,

M.D.'s, P.A., 104 F.3d 1256, 1261 (11th Cir. 1997); Lawrence v. Dunbar, 919 F.2d 1525, 1529 (11th Cir.1990). "Factual attacks" challenge subject matter jurisdiction in fact, irrespective of the pleadings. Garcia, 104 F.3d at 1261. Here, Defendants have mounted a factual attack to this Court's jurisdiction.

Because at issue in a factual 12(b)(1) motion is the trial court's jurisdiction–its very power to hear the case–there is substantial authority that the trial court is free to weigh the evidence and satisfy itself as to the existence of its power to hear the case. In short, no presumptive truthfulness attaches to plaintiff's allegations, and the existence of disputed material facts will not preclude the trial court from evaluating for itself the merits of jurisdictional claims. Id. (quoting Lawrence, 919 F.2d at 1529).

**A. False Claims Act Background**

Section 3730(b)(1) of the FCA allows private-citizen plaintiffs–relators–to bring a civil action in the name of the United States Government to expose fraud committed by third-parties against the Government. 31 U.S.C. 3730(b)(1) (2008).[4] In return for their service, relators are entitled to a percentage of the

---

[4]The False Claims Act was amended in 2010. However, as the Supreme Court has ruled, those amendments were not retroactive to cases which were then-currently pending. Schindler Elevator Corp. v. United States ex rel. Kirk, --- U.S. ---, 131 S. Ct.

damages received as a bounty. <u>See</u> 31 U.S.C. § 3130(e) (2008). This bounty

creates a double-edged sword–it encourages insider plaintiffs to come forward

and expose fraud, but it also encourages parasitic suits in search of their share of

the bounty. To this end, "Congress has therefore included a number of

provisions that further the golden mean between adequate incentives for whistle-

blowing insiders with genuinely valuable information and discouragement of

opportunistic plaintiffs who have no significant information to contribute of their

own." <u>In re Natural Gas Royalties Qui Tam Litigation</u>, 566 F.3d 956, 960 (10th

Cir. 2009) (internal quotations and omissions omitted) (quoting <u>United States ex.</u>

<u>rel. Maxwell v. Kerr-McGee Oil & Gas Corp.</u>, 540 F.3d 1180, 1184 (10th Cir.

2008)). Two of these provisions are at issue here: the so-called "first-to-file" bar

and the "public disclosure" bar.

   B. First-to-File Bar

   The first-to-file bar states that "[w]hen a person brings an action under

this subsection, no other person than the Government may intervene or bring a

<u>related action</u> based on facts underlying the <u>pending action</u>." 31 U.S.C. §

_____

1885, 1890 n.1 (2011). Thus, this Court will apply the statute as it existed at the time
this suit was filed in 2008.

3730(b)(5) (2008) (emphasis added). "This provision creates a jurisdictional limit on a court's authority to hear duplicative qui tam suits." United States ex. rel. Torres v. Kaplan Higher Educ. Corp., No. 09-21733-CIV, 2011 WL 3704707, at *4 (S.D. Fla. Aug. 23, 2011) (citing United States ex. rel. Grynberg v. Koch Gateway Pipeline Co., 390 F.3d 1276, 1278 (10th Cir. 2004)). Relators argue that this provision does not bar their claims because 1) the prior *qui tam* actions were dismissed prior to this complaint–and thus were not "pending" when this complaint was filed, and 2) this action is not a related action as Defendant AIU was never a named defendant in the prior actions.

> ### 1. The Prior *Qui Tam* Actions Are "Pending" Under the First-To-File Bar.

Relators first argue that because the prior actions had all been dismissed prior to this complaint's filing, the prior actions were not "pending" under the statute. It appears that this issue is one of first impression.

> The first rule in statutory construction is to determine whether the language at issue has a plain and unambiguous meaning with regard to the particular dispute. If so, we need not inquire further. We look at the entire statutory context rather than to words in isolation. We interpret a statute in a manner consistent with the plain language of the statute, unless doing so would lead to an absurd result.

10

United States v. Shanks, 452 Fed. App'x 922, 924-25 (11th Cir. 2012) (internal citations and quotations omitted).

Here, in turning to the plain language of the statute, it is evident that Congress was referring to two actions in this provision: 1) the first-filed action ("When a person brings an action . . . ) and 2) the second-filed action (" no other person than the Government may intervene or bring a related action . . ."). Looking at the context of the phrase, the word "pending" refers back to the first-filed action. Meaning, "pending" is used as a short-hand for the first-filed action, and "pending" was used instead of some other term so that the courts would compare the first-filed action's most recent allegations with the second-filed action's complaint. See Grynberg, 390 F.3d at 1279 (stating that the court is to determine whether the second-filed action is a "related action" by looking at the first-filed action's most recent complaint–or its "pending" status). This is logical because Congress' purpose in creating the first-to-file bar was to balance the need for whistle-blowers with the concern of parasitic suits. By using "pending," and thus comparing the allegations as set out through the most-recently filed complaint with the related action, Congress assured that the court would be reviewing the most-recent factual allegations in determining whether the

11

Government already had notice of the claims and whether the related action should be barred. Therefore, the ultimate meaning of the clause is that the related action cannot be based on any facts raised in the first-filed action, whether its initial or any subsequently amended complaint.

Plaintiffs never expressly define what they believe "pending" to mean but essentially argue that "pending" means "active," in that once the first-filed action is dismissed, any related action can be brought to vindicate the same fraud. And, they argue that if the Court does not find "pending" to equate to "active," "once a defendant was sued in a *qui tam* action it would always be protected from any subsequent attempt to hold it accountable for its fraudulent conduct." Rel. Resp., Dkt. No. [153] at 18.

However, that is not true. First, Plaintiffs' definition would create perverse incentives and"reappearing" jurisdiction. Essentially, potential relators would sit on the sidelines hoping that the first relators' claims would be dismissed so that they could then file their own complaint later and receive the bounty. However, that would run contrary to Congress' intent in enacting the statute. Congress intended the statute to assist the Government in exposing fraud and recouping funds from the public fisc. See United States ex. rel. Lujan v.

<u>Hughes Aircraft Co.</u>, 243 F.3d 1181, 1187 (9th Cir. 2001) ("The first-filed claim provides the government notice of the essential facts of an alleged fraud, while the first-to-file bar stops repetitive claims.").  Further, the first-to-file bar was enacted create a "race to the courthouse among eligible relators, which may spur the prompt reporting of fraud." <u>United States ex. rel. Branch Consultants v. Allstate Ins. Co.</u>, 560 F.3d 371, 377 (5th Cir. 2001.  If all that mattered was for the first action to be dismissed, then a race to the courthouse would not occur as subsequent relators would wait hoping that the first-filed action would be dismissed, and fraud would continue to occur in the interim. Moreover, a relator would be able to file, dismiss, and re-file identical *qui tam* actions, thus encouraging forum shopping and wasting government resources that would be required to review the claims in each action.

Also, such an interpretation would create a bizarre result because if the second set of relators filed their complaint sooner–and while the first suit was still active–they would be barred, even under Plaintiffs' interpretation. But, if the second set waited the likely years it would take for a dismissal in the first–or here, first four–actions, they would be rewarded. Interestingly, the fact that the prior cases have been dismissed–and not settled by judgment or

13

otherwise–supports the notion that the original claims did not have merit in some way or another.

As well, Plaintiffs' definition does not comport with who is the actual plaintiff in a *qui tam* suit–the Government. See Makro Capital of Am. Inc. v. UBS, AG, 543 F.3d 1254, 1260 (11th Cir. 2008) ("Since the underlying purpose of the FCA is to encourage private disclosure of false claims harming the government, these limitations correlate with the idea that the private plaintiff is merely acting as a stand-in for the government. The 'first-to-file' bar reflects the understanding that a corresponding government-initiated action would have involved only a single suit.") (emphasis added). Ultimately, once the Government has notice of potential fraud, the purposes of the FCA are vindicated. Branch Consultants, 560 F.3d at 378 ("[A] relator who merely adds details to a previously exposed fraud does not help reduce fraud or return funds to the federal fisc, because once the government knows the essential facts of a fraudulent scheme, it has enough information to discover related frauds.") (internal quotations omitted). Thus, here, the ultimate plaintiff–the Government–has already sued these defendants four other times. See infra. If a subsequent relator's claims are exactly the same as prior relators' claims, the

14

policies behind the statute do not support successive suits simply because the first suits were dismissed.

Additionally, the Government's interests are still protected by this Court's decision. First, the first-to-file bar only prevents related suits by private relators–not the Government. 31 U.S.C. § 3730(5) (2008) ("no person <u>other than the Government</u> may intervene or <u>bring a related action</u>") (emphasis added). And, the Government must approve any *qui tam* dismissal. 31 U.S.C. § 3730(b)(1) (2008) ("The action may be dismissed only if the court and the Attorney General give written consent to the dismissal and their reasons for consenting."). It is unlikely the Government would approve dismissal of meritorious claims against it; thus, meritorious claims are more likely to have avoided dismissal at the first instance.

It appears that no court has yet addressed the exact issue before this court. However, dicta from the Ninth Circuit's opinion in <u>Lujan</u> supports this Court's interpretation. In <u>Lujan,</u> the Ninth Circuit was asked to determine if a second-filed related action (which was filed while the first-filed suit was still active) was still barred once the first-filed action was dismissed. 243 F.3d at 1188. The plaintiff there argued that because the first suit had been dismissed, his action

should be allowed to proceed. Id. However, the Circuit stated "[t]o hold that a later dismissed [first-filed] action was not a then-pending action would be contrary to the plain language of the statute and the legislative intent. Dismissed or not, [the first-filed] action promptly alerted the government to the essential facts of a fraudulent scheme–thereby fulfilling a goal behind the first-to-file rule." Id.  As in Lujan, once the Government was on notice of the fraud, it is of no consequence whether the first-filed suit was dismissed–the Government was aware of the possible fraud against it. Thus, the Court finds that prior, previously dismissed actions are "pending" for purposes of the first-to-file rule.

### 2. Prior Related *Qui Tam* Suits Against CEC and AIU Online Bar Plaintiffs' Claims.

Plaintiffs additionally argue that their suit is not "related" to the prior actions as Defendant AIU has never been previously sued.[5] However, Plaintiffs

---

[5]Plaintiffs do not counter the Defendants' arguments that the factual allegations underlying the at-issue claims–*i.e.* the POG claim and the incentive-based compensation claim–were plead in the preceding *qui tam* suits. See Rel. Opp., Dkt. No. [153] at 19-28. Rather, Relators argue that the prior suits' failure to sue AIU saves their claims. Thus, the Court finds Defendants arguments as to the claims' substantive relatedness are unopposed. See LR 7.1(B), NDGa ("Failure to file a response shall indicate that there is no opposition to the motion."). And, the Court will only determine whether the prior suits' allegations would bar a claim against AIU here.

16

do not respond to Defendants' arguments that the POG and incentive-based compensation claims have been brought before against CEC. Thus, those claims are **DISMISSED**, **without prejudice** as to CEC. <u>See</u> LR 7.1(B), NDGa ("Failure to file a response shall indicate that there is no opposition to the motion.").

Turning to Defendant AIU, the question left before this court is whether the previous *qui tam* actions are "related" to the current one. AIU argues that, in order for the first-to-file bar to attach, the prior fraud claims must have been brought against the "*same* defendant based on the same kind of conduct." Rel. Opp., Dkt. No. [153] at 19 (quoting <u>United States *ex rel.* Whitten v. Comm. Health Sys., Inc.</u>, 575 F. Supp 2d 1367, 1385 (S.D. Ga. 2008) ("<u>Whitten II</u>")). In support of this argument, the Plaintiffs rely on <u>Whitten II</u> and <u>United States *ex rel.* Cooper v. Blue Cross Blue Shield of Fla., Inc.</u>, 19 F.3d 562 (11th Cir. 1994). However, those cases are easily distinguishable on their facts and on the law.

In <u>Cooper</u>, the Eleventh Circuit found that public disclosures about BCBS of Georgia did not trigger a separate jurisdictional provision–the public disclosure bar–for BCBS of Florida. 19 F.3d at 566. Specifically, the Court stated:

17

> Requiring that allegations specific to a particular defendant be publically disclosed before finding the action potentially barred encourages private citizen involvement and increases the chances that every instance of specific fraud will be revealed. To hold otherwise would preclude any *qui tam* suit once widespread–but not universal–fraud in an industry was revealed.

Id. at 566.

However, the Court does not find that Cooper controls this case. First, Cooper involved the public disclosure bar–not the first-to-file bar. Thus, at a basic level, that court was interpreting a different provision. And, because the mere disclosure of information to the general public is very different in quality and kind than complaint allegations which the United States Government has previously investigated, the Court does not find that the policy upon which the Cooper court relied is persuasive here. But additionally, on its facts, Cooper did not involve a parent/subsidiary relationship, but rather dealt with sister corporations. Thus, the fact that BCBS of Georgia was committing fraud did not mean that its sister corporation was also doing so. There was no evidence that BCBS of Georgia controlled BCBS of Florida, or that the parent company to them both was organizing the fraud.

18

Additionally, the Court finds that Whitten II's reliance on Cooper in the first-to-file context is not persuasive. As stated above, the Court does not find that the policies which underlie the public disclosure bar are appropriate here. Moreover, Whitten II's facts are distinguishable as that case involved a prior suit against an unaffiliated company which only had a contractual relationship with the Whitten II defendant, and the prior lawsuit did not assert that the Whitten II defendant had committed any fraud. Thus, there were never allegations of fraud which involved the Whitten II defendant in the prior suit, much less its parent company.

Other courts that have addressed the issue have refused to accept a "same defendant" rule and have instead reviewed each suit's complaint to determine if alleging a different named defendant created a materially different fraud allegation. See Natural Gas, 566 F.3d at 961-62 (10th Circuit); Branch Consultants, 560 F.3d at 379-80 (5th Circuit); United States ex. rel. Hampton v. Columbia/HCA Healthcare Corp., 318 F.3d 214, 218-19 (D.D.C. 2003); Grynberg, 390 F.3d at 1280 n.4 (10th Cir.). In Hampton, the District of Columbia Circuit found that a first-filed action against a corporation alone barred a related action against the corporation, its Georgia subsidiary, and

19

several of the subsidiary's employees because alleging additional defendants did

not create materially-different fraud allegations. 318 F.3d at 218-19. There, the

relator had argued that her suit could not be barred by the first-to-file bar

because the Georgia subsidiary and its employees had not been named in the

first-filed action. The District rejected this test and instead compared the specific

<u>factual</u> allegations of the suits. The first-filed action had noted a "corporate-wide

problem" of Medicare fraud and specifically listed six "examples" of fraud

which did not include Georgia. However, those instances were described as

"samplings" of "a huge number of illegal payments from Medicare . . . received

by [the corporation's] 550 home health locations in 37 states." <u>Id.</u> at 218. The

Circuit ultimately found that "[g]iven [the first-filed relator's] broad allegations

based on his position as [the corporation's] insider, Hampton's naming Clinical

Arts–a specific . . . subsidiary–and naming individual employees of Clinical Arts

were merely variations on the fraud Boston's complaint described." <u>Id.</u>; <u>see also</u>

<u>Natural Gas</u>, 566 F.3d at 962 ("When defendants are part of the same corporate

family, however, they will often be jointly liable for the same underlying

conduct. Cases involving parents, subsidiaries, and other corporate affiliates

might therefore require deviations from the general requirement that claims must

share common defendants in order to trigger the first-to-file bar."); Grynberg, 390 F.3d at 1280 n.4 (finding that the relator's naming of additional affiliated entities in his complaint could not skirt the first-to-file bar as that variation did not "change the fact that the [first-filed] and [second-filed] complaints alleged the same essential claim of fraud.").

In contrast, the Fifth Circuit has  refused to find that "a first-filed action [could bar claims] against wholly unrelated defendants brought in a subsequent action." Branch Consultants, 560 F.3d at 379. The Fifth Circuit distinguished Hampton and its progeny as cases which involved related suits against "corporate affiliates and subsidiaries," and found that because the first-filed action there only involved four out of ninety-five insurers involved in Hurricane Katrina, and the first-filed complaint did "not allege true industry-wide fraud or concerted action among a narrow group of participants," id. at 380 (emphasis added), relator's second-filed action was not "related."

First, the Court finds that due to Relators' statements *en judicio*, they are foreclosed from asserting that AIU was not previously sued as they have stated that "Defendant AIU is a for-profit institution of higher education with five campuses nationwide, including an "online" program." Pl.'s Opp. to Prot. Ord.,

Dkt. No. [98] at 6 (citing Cmpl., Dkt. No. [1] at ¶ 11). Thus, Relators have

admitted that AIU Online is part and parcel of Defendant AIU. And, the Relators

have argued that they should be able to discover information from AIU Online,

*inter alia*, because the DOE would not distinguish between the individual brick-

and-mortar AIU campuses or its online presence for DOE-sanction purposes. Id.

at 14 ("[T]he DOE treats schools with multiple locations as a single institution

for purposes of eligibility for Title IV funds. Indeed, HEA regulations regarding

eligibility for Title IV funds only refer to a single institution, and do not allow

for eligibility for a single campus. Moreover, the PPA, which institutions must

sign to be eligible for federal funding, applies to the underline entire institution, not merely

a single location."). Therefore, because Relators have not challenged that the

POG and incentive-based compensation frauds have been previously alleged

against AIU Online and the Court finds that  Relators admitted that the two are

one for the DOE's purposes, Relators' claims are barred.

But, even if AIU and AIU Online are not one entity due to their corporate

forms, the Court still finds that Relators' POG and incentive-based

compensation claims are barred by the first-to-file bar. First, the Hanson

complaint encompassed the POG and incentive-based compensation claims at-

issue here. Relator Hanson was the National Manager of CEC and "all of the Directors of Career Services at all of CEC's eighty+ 'brick and mortar schools' had a dotted line relationship to her;" she was a corporate insider who was dotted-line responsible for all AIU schools.  Hanson, Dkt. No. [124-6] at ¶ 16. Specifically, Hanson alleged the same incentive-based compensation claim for recruiters that is at-issue here–that recruiters received additional compensation, bonuses, and trips for their recruitment numbers. Id. at ¶ 7. Further, Relator Hanson plead that she "audited each of CEC's brick and mortar schools. Her audits disclosed significant problems with the student's admission and placement files." Id. at ¶ 33 (emphasis added). Thus, Relator Hanson plead that the fraud was corporate-wide, not just at CEC and AIU Online. Further, in Tice, the relators plead that "[t]he false certifications regarding proof of high school graduation/equivalent occurred primarily in CEC's American InterContinental University schools." Dkt. No. [124-6] at ¶ 13 (emphasis added).

The Court finds that the Relators' inclusion of AIU is not a materially different fraud allegation. The ultimate facts at issue here and the improper conduct alleged are exactly the same. There is no doubt that the prior *qui tam* suits have already fulfilled the purpose of the FCA–to put the Government on

notice of the fraud. Like the first-filed complaint in  Hampton, Hanson involved

a corporate insider who alleged a corporate-wide fraud scheme which included

the claims at issue here. Relators have not provided any materially different facts

which would keep their claims from being related, and the fact that none of the

prior relators worked for AIU will not resuscitate their claims. See Grynberg,

318 F.3d at 217-19 (stating that the Court's inquiry is to determine whether the

complaints allege "differences in the material elements of the fraud" and, thus,

not the identity of the relator).  Therefore, the POG and incentive-based

compensation claims are also **DISMISSED, without prejudice** as to AIU.

    C. Public Disclosure Bar

    Because the Court finds that Relators' POG and incentive-based

compensation claims are barred by the first-to-file bar, the Court declines to

decide at this time if these claims would also be barred by the public-disclosure

bar.

**III. Partial Motion for Summary Judgment[6]**

_____

    [6]Defendants have also moved to supplement their Statement of Material Facts.
However, because those supplements only go to the two claims which this Court has
previously dismissed–the POG and incentive-based compensation claims–that Motion
[145, 147] is **DISMISSED, as MOOT**. See Dkt. No. [145-1] (stating that the new

24

Defendants also move for summary judgment against Relators Plumley,

Dobson, and Powell, arguing that they all signed broad releases when they left

the Defendants' employment which bar their claims. Relators do not challenge

that the releases' wording would encompass *qui tam* suits on their face.[7]

However, they argue that public policy and the rule in every Circuit to address

this issue outside of bankruptcy[8] would prevent enforcement here.

The parties both agree that this inquiry is governed by the Supreme

Court's standard in <u>Town of Newton v. Rumery</u>, 480 U.S. 386 (1987). In

evidence is evidence which was previously presented on the motion to dismiss).

[7] In return for four or five weeks pay, Plumley, Powell, and Dobson each agreed that they were

> waiving and releasing all known or unknown claims or causes of action against the Company, its parent company, divisions, subsidiaries, affiliates and predecessors, and each of their assigns, successors, officers, directors, employees, shareholders, and agents, which claim have or could have arisen out of [the Relators'] employment with and/or termination of employment from the Company and/or any other occurrence whatsoever arising on or before the date this Agreement is executed.

Dkt. No. [115-2] at ¶¶ 18-20.

[8] <u>See</u> <u>United States ex. rel. Gebert v. Transport Admin. Servs.</u>, 260 F.3d 909, 916 (8th Cir. 2001) (enforcing a pre-filing release in bankruptcy, but stating "the unique context of this case will have an exceedingly narrow application and, accordingly, will avoid nearly all of the public-interest harms discussed in [*qui tam* suits outside the bankruptcy context].").

AO 72A
(Rev.8/82)

Rumery, the Supreme Court stated that "a promise is unenforceable if the interest in its enforcement is outweighed in the circumstances by a public policy harmed by enforcement of the agreement." 480 U.S. at 392. Thus, the question here is whether the public policy in exposing fraud against the government outweighs the private right of contract.

The majority of courts to address whether a pre-filing release may bar *qui tam* suits apply the Ninth Circuit's reasoning in United States ex. rel. Green v. Northrop Corp., 59 F.3d 953 (9th Cir. 1995) and United States ex. rel. Hall v. Teledyne Wah Chang Albany, 104 F.3d 230 (9th Cir. 1997). In Green, the Ninth Circuit found that a pre-filing release of *qui tam* claims did not bar a subsequent *qui tam* suit because the public interest in learning of fraud trumped encouraging settlement. Ultimately, the Ninth Circuit held that "prefiling releases of *qui tam* claims, when entered into without the United States' knowledge or consent, cannot be enforced to bar a subsequent *qui tam* claim." 59 F.3d at 966. Applying that rule to the facts, the Ninth Circuit refused to enforce a pre-filing release as it was only through the *qui tam* filing that the Government learned of the government contractor fraud at issue. Id.

26

In <u>Hall</u>, the Ninth Circuit again applied its reasoning in <u>Green</u> but reached the opposite result. There, the Ninth Circuit enforced the pre-filing release because the government was aware of Hall's allegations when the release was signed. 104 F.3d at 233. The <u>Hall</u> Court stated that "the public interest in having information brought forward that the government could not otherwise obtain is not implicated. The public interest in the use of *qui tam* suits to supplement federal enforcement of the FCA is also not disturbed, because the federal government had already investigated the allegations prior to the settlement." <u>Id.</u> The Circuit also noted that because the Government was not a party to the release, it could still pursue the claims on its own behalf. <u>Id.</u>

Consistent with the majority of other courts, the Court finds that the so-called "governmental knowledge test" strikes the appropriate balance between exposing governmental fraud and preserving settlement. <u>See</u> <u>United States ex. rel. Radcliffe v. Purdue Pharma, L.P.</u>, 600 F.3d 319, 332 (4th Cir. 2010) ("When the government is unaware of potential FCA claims the public interest favoring the use of qui tam suits to supplement federal enforcement weighs against enforcing prefiling releases. But when the government is aware of the claims, prior to suit having been filed, public policies supporting the private settlement

27

of suits heavily favor enforcement of a prefiling release. . . . We find that application of this "government knowledge" rule meets the balancing analysis under Rumery."); United States ex. rel. Ritchie v. Lockheed Martin Corp., 558 F.3d 1161, 1168-70 (applying the government knowledge test).  Moreover, this approach has been advanced by the Government as amicus curiae in other cases as it balances the need to expose fraud with the encouragement of settlement and finality. See Radcliffe, 600 F.3d at 331. And, if a defendant wishes to settle its claims, this rule promotes settlement as all the defendant has to do is alert the government to the fraud and its settlement with potential relators would then be enforceable. Essentially, this approach cuts to the heart of the FCA–exposing fraud against the Government.

Defendants argue that enforcing these relators' releases will not violate public policy or harm the government's interest as the Government has already had "ample opportunity to investigate the claims" and declined to intervene in this case. In support of their position, Defendants cite United States ex. rel. Whitten v. Triad Hospitals, Inc., No. A. CV202-189, 2005 WL 3741538 (S.D. Ga. 2005), rev'd and rem'd on other grounds, 210 Fed. App'x 878 (11th Cir. 2005) ("Whitten I"). In Whitten I, the Southern District of Georgia was asked to

28

determine whether a waiver which included *qui tam* suits–but specifically excluded employment-related suits–should bar plaintiff's ability to bring a subsequent *qui tam* suit. There, the Court reviewed <u>Green</u> and distinguished it, holding that the <u>Green</u> court did not "consider whether a relator who has signed a release ought to be able to *maintain* a *qui tam* action in cases where the government has declined to intervene." <u>Id.</u> at *4. Ultimately, the <u>Whitten I</u> court ruled that pre-filing releases are enforceable if the Government decides not to intervene in the action.

However, this Court does not find that the Government's intervention should control whether a release should be valid. First, the Government can elect not to intervene for a variety of reasons, many of which–such as availability of United States Attorneys–have nothing to do with the merits. And "[n]on-intervention does not necessarily signal governmental disinterest in an action, as it is entitled to most of the proceeds even if it opts not to intervene." <u>United States ex. rel. Decarlo v. Kiewit/AFC Enters., Inc.</u>, 937 F. Supp. 1039, 1047 (S.D.N.Y. 1996). Moreover, because a potential relator could not know with certainty that the Government would intervene in an action, less relators would come forward and expose fraud–the key purpose of the FCA. In sum, the

29

Court rejects the <u>Whitten I</u> approach and will apply the "government knowledge" test.

Here, following the Court's rulings <u>supra</u>, the only remaining conduct is the SACS accreditation fraud. In reviewing Defendants statement of material facts, there is no evidence that the Government was aware of this conduct prior to this lawsuit's filing. Moreover, that is confirmed as the Defendants did not move to dismiss this conduct for violations of the first-to-file or public disclosure bar as it did with the other claims. Thus, because there is no evidence that the Government had knowledge of the SACS accreditation fraud, any claims based upon that conduct remains. Thus, Defendants' Motion for Partial Summary Judgment [115] is **DENIED**.

## IV. Conclusion

Based on the foregoing, Defendants' Motion to Dismiss for Lack of Subject Matter Jurisdiction [124, 146] is **GRANTED** and Defendants' Motion for Partial Summary Judgment [115] is **DENIED**. Defendants' Motion for Leave to File Amended Statement of Material Facts [145, 147] is **DENIED, as MOOT**. The SACS accreditation claim remains for all Relators.

**SO ORDERED**, this 12th day of July, 2012.


RICHARD W. STORY
UNITED STATES DISTRICT JUDGE

AO 72A
(Rev.8/82)