**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA *ex rel.* MELISSA SIMMS POWELL, *et al.*, | : : : : | |
| Plaintiffs, | : : | CIVIL ACTION NO. 1:08-CV-02277-RWS |
| v. | : : | |
| AMERICAN INTERCONTINENTAL UNIVERSITY, INC., *et al.*, | : : : : | |
| Defendants. | : | |

## <u>ORDER</u>

This case comes before the Court on Defendant American

Intercontinental University, Inc.'s Motion for Summary Judgment [332],

Defendant Career Education Corp.'s Motion for Summary Judgment [334],

Relators' Motion for Leave to File Sur-Reply [386], Defendants' Motion to

Exclude Expert Opinions of Daniel Madzelan [393], Defendants' Motion to

Exclude the Opinions and Testimony of Martin Gonzalez [397], Defendants'

Motion to Strike Relators' Disclosure of Non-Retained Experts [400], and

Defendants' Motion to Strike Declarations of Martin Gonzalez and Daniel

Madzelan [421]. After reviewing the record, the Court enters the following Order.

## Background

This *qui tam* action under the False Claims Act ("FCA") arises out of Defendants Career Education Corp. ("CEC") and American InterContinental University's ("AIU") alleged false certification to the Government that AIU was properly accredited, which enabled AIU to receive hundreds of millions of dollars in federal funds through student financial aid programs. Relators are former employees of AIU.

## I. Overview of Title IV of the Higher Education Act

Congress created federal financial aid programs through Title IV of the Higher Education Act ("HEA") to broaden access to higher education. See Ass'n of Private Sector Colls. & Univs. v. Duncan, 681 F.3d 427, 435 (D.C. Cir. 2012) (providing an overview of Title IV). Every year these programs provide over $150 billion in aid to fourteen million post-secondary students at private for-profit institutions, public institutions, and private nonprofit institutions. Id. To prevent schools from abusing this system, "[w]hen an educational institution wishes to receive federal subsidies under Title IV and the

Higher Education Act, it must enter into a Program Participation Agreement

with the Department of Education ("DOE"), in which it agrees to abide by a

panoply of statutory, regulatory, and contractual requirements." United States

ex rel. Hendow v. Univ. of Phoenix, 461 F.3d 1166, 1168 (9th Cir. 2006).

One such requirement is the incentive-compensation ban, under which an

institution agrees it "will not provide any commission, bonus, or other incentive

payment based directly or indirectly on success in securing enrollments or

financial aid to any persons or entities engaged in any student recruiting or

admission activities." 20 U.S.C. § 1094(a)(20). "Congress adopted this

provision in 1992 based on its concern that schools were creating incentives for

recruiters to enroll students who could not graduate or could not find

employment after graduating." Ass'n of Private Sector Colls. & Univs., 681

F.3d at 436.

Additionally, institutions of higher education are required to be

accredited in order to qualify for funds under Title IV programs. 20 U.S.C. §

1099c(a); see also id. § 1099b (describing criteria accrediting associations must

meet "to be a reliable authority" on accreditation). Therefore, the institution

must agree in the program participation agreement that it "will meet the

3

requirements established by the Secretary and accrediting agencies or associations." Id. § 1094(a)(21). The accrediting association that evaluated AIU was the Southern Association of Colleges and Schools ("SACS"), and its requirements are detailed in SACS's *Principles of Accreditation*. (See generally *Principles*, Dkt. [340-5].) According to the *Principles*, "[t]he process for initial and continued accreditation involves a collective analysis and judgment by the institution's internal constituencies, an informed review by peers external to the institution, and a reasoned decision by the elected members of the Commission on Colleges." (Id. at 7.) To that end, the SACS Commission on Colleges evaluates and makes accreditation decisions based on an institution's compliance with four categories of standards: (1) the "Principle of Integrity," (2) core requirements, (3) comprehensive standards, and (4) federal requirements. (See id.)

First, the Principle of Integrity reflects SACS's expectation that institutions "make reasonable and responsible decisions consistent with the spirit of integrity in all matters." (Id. at 10.) Thus, SACS considers conduct such as withholding information, failing to provide timely and accurate information to the Commission, or failing to conduct a candid review of an

4

institution's own compliance with the *Principles* to evidence "lack of a full commitment to integrity."  (Id.)  Failure to adhere to this principle may result in losing accreditation.  (Id.)

Second, SACS promulgates core requirements, which "are basic, broad-based, foundational requirements that an institution must meet to be accredited with the Commission on Colleges."  (Id. at 11.)  The core requirements state, for example, that an accredited institution must have authority to grant degrees; have "a clearly defined, comprehensive, and published mission statement"; have an adequate number of full-time faculty members; and have adequate physical resources to support its mission and its programs.  (See id. at 11-13.)

Third, the comprehensive standards include more detailed requirements in the areas of "(1) institutional mission, governance, and effectiveness; (2) programs; (3) resources; and (4) institutional responsibility for Commission policies."  (Id. at 14.)  And finally, the fourth section of the *Principles* states that "institutions are required to document compliance with [DOE statutes and regulations,] and the Commission is obligated to consider such compliance when the institution is reviewed for initial membership or continued

5

accreditation." (Id. at 21.)

## II. SACS's Investigation of AIU

In December 2004, SACS authorized a Special Committee to investigate various suspected violations of SACS *Principles*. (See 2005 Action Letter, Dkt. [336-2].) After reviewing AIU's practices, in 2005 the Special Committee issued a comprehensive Report addressing numerous areas where AIU was failing to meet SACS standards. The Committee grouped the violations into ten "functional areas of concern" ranging from admissions and marking to curriculum and grading practices. (2005 Report, Dkt. [336-5] at 3.) One finding was that "admissions personnel [were] pushing aggressively to quickly enroll students," and while AIU informed the Special Committee that its "admissions staff were not sales people," the Committee found that "promotions and advancement within the organization for admissions staff were apparently contingent upon meeting or exceeding student recruitment goals." (Id. at 7-9.) The 2005 Report included four recommendations regarding admissions practices, including "that the University demonstrate that it has established and continuously implemented appropriate quality control policies, standards and practices for its marketing, recruitment, admissions, enrollment,

financial aid, and refund processes." (Id. at 10-11.)  Moreover, the 2005 Report

expressed concerns "about possible breaches in integrity associated with the

handling of grades and changes related thereto, as well as the handling of

recruiting and admissions practices."  (Id. at 30.)

Following the December 2005 meeting of the SACS Commission on

Colleges, SACS sent AIU an Action Letter informing the school that it was

being placed on probation.  (2006 Action Letter, Dkt. [337-1] at 8.)  The Action

Letter explained:

> Please note that Federal regulations and Commission policy
> stipulate that an institution must remedy deficiencies within two
> years following the Commission's initial action on the institution.
> At the end of that two-year period, if the institution is not in
> compliance with the *Principles of Accreditation*, representatives
> from the institution may be required to appear before the
> Commission, or one of its standing committees, to answer
> questions as to why the institution should not be removed from
> membership.  Please note that an institution's accreditation cannot
> be extended if it has been on Probation for two successive years.  If
> the institution is not in compliance at the end of two years of
> Probation, removal from membership is mandatory.

(Id. at 8.)

Relators argue that AIU then falsely represented to SACS in its

7

September 2006 First Monitoring Report that it was taking steps to "demonstrate a significant shift from the aggressive sales-driven admissions and marketing culture that existed at the time of the Special Committee visit in July 2005." (First Monitoring Report, Dkt. [333-1] at 7.) Relators assert that AIU greatly misrepresented its efforts to improve its sales-driven admissions department and instead continued to focus on meeting quotas. (See Relators' Resp., Dkt. [355] at 22-31.) For example, Relators contend that "AIU lied to SACS regarding its implementation of its 'most critical change' to its admissions function—the evaluation of admissions advisors. Although AIU purported to implement new advisor 'scorecards,' touted to SACS as evidence that AIU was focusing less on enrollments and more on retention of students, in reality, admissions advisors advanced or were fired solely by sales metrics—enrollments and starts." (Id. at 26.) Relators also cite evidence that AIU hid white boards tracking student enrollments and starts during SACS visits. (Id. at 28.)

The Special Committee issued another Report in 2006 but again found that AIU was not yet in compliance with many SACS *Principles*. (See generally 2006 Report, Dkt. [337-5].) Relators allege that AIU continued to

hide its sales culture, even removing information about admissions advisors'

sales backgrounds from resumes and personnel files. (See Relators' Resp., Dkt.

[355] at 34-35.) Relators additionally point to evidence that throughout 2007

AIU stepped up noncompliant behavior, such as holding competitions among

admissions advisors, yet told SACS it had abandoned these practices. (See id.

at 40-41.)

In response to being placed on probation, AIU also told SACS that it was

implementing questionnaires to gauge prospective students' interest, desire, and

motivation ("IDM") in attending AIU. (See First Monitoring Report, Dkt.

[333-1] at 56.) The IDM tool was designed to move away from sales-oriented

admissions to practices more consistent with students' academic interests.

According to testimony of former AIU employees, however, AIU abandoned

this practice after SACS's 2007 visit and instead instructed admissions advisors

to assume a student's interest while it promoted a false sense of urgency in

completing admissions packets. (See Relators' Resp., Dkt. [355] at 43-45.)

Another key area of noncompliance Relators identify is AIU's disregard

for maintaining an adequate number of faculty with terminal degrees in their

fields. Specifically, Relators contend that AIU failed to ensure that at least 25%

9

of its faculty had terminal degrees.  (Id. at 46.)  The 2005 Special Committee

Report identified certain AIU campuses that lacked enough full-time faculty

and then recommended that AIU "demonstrate that it has an adequate number

of full-time faculty to support the mission of AIU-Los Angeles and AIU-

Buckhead campuses," and "employ competent faculty members qualified to

accomplish the mission and goals of the institution on its AIU-Buckhead

campus."  (2005 Report, Dkt. [336-5] at 17-18.)  The following year, the

Special Committee similarly addressed the continued need for full-time faculty

at the AIU-Los Angeles Campus.  (See 2006 Report, Dkt. [337-5] at 28-29.)

The two reports did not specifically address the issue of terminal degrees,

although the *Principles* list a set of guidelines concerning faculty credentials in

its comprehensive standards section.  One guideline reads: "At least 25 percent

of the discipline course hours in each undergraduate major are taught by faculty

members holding the terminal degree—usually the earned doctorate—in the

discipline."  (*Principles* § 3.7.1(d), Dkt. [333-4] at 30.)

In any event, Relators argue that "AIU played fast and loose with the

rules" by "renting [a terminally degreed faculty member] until SACS is done."

(Relators' Resp., Dkt. [355] at 46-47.)  However, Relators provide no

information about who this faculty member was or what he taught.  Relators also point to an e-mail from a faculty member at AIU-Dunwoody to AIU Deans informing them that the faculty roster and course schedule contained "numerous discrepancies," and so "all our data on [the terminal-degree requirement] is also wrong. This will have to be redone immediately."  (Gadberry E-mail, Dkt. [375-6] at 3.)  The e-mail also listed the faculty members whose teaching assignments were inconsistent with the course schedule.

Aside from the above alleged violations of SACS's *Principles*, Relators argue that AIU's conduct also violated SACS's Principle of Integrity.  Further, Relators note that by 2007, AIU had been on probation for two years, and so SACS would have revoked AIU's accreditation if SACS had determined it was still not complying with the *Principles*.  Thus, as the 2006 Action Letter warned, failure to comply after two years of probation would automatically result in accreditation being revoked.  Relators cite several expert witnesses in arguing that integrity violations would likely have led to AIU's loss of accreditation.  (Relators' Resp., Dkt. [355] at 49.)  As Relators argue, "SACS did not know AIU defrauded it, and therefore did not remove AIU's accreditation."  (Id.)  SACS lifted AIU's probation in December 2007.  (2008

11

Action Letter, Dkt. [340-1].)

Meanwhile, on March 2, 2007, Robert E. Dowdell, the CEO of AIU's parent company, CEC, submitted AIU's Program Participation Agreement ("PPA") to the DOE representing that AIU was in compliance with all DOE and SACS requirements. (See PPA, Dkt. [333-12] at 17.) Consequently, AIU remained eligible to receive funds under Title IV, which Relators contend resulted in fraudulent payments of hundred of millions of dollars from the United States to AIU.

## III.    Procedural History

Based on the above allegations, Relators brought this *qui tam* action against AIU and CEC on July 14, 2008, under the False Claims Act. Relators alleged that AIU submitted false claims to the Government because it represented to the DOE that it was complying with Title IV and was accredited, yet in truth it was violating the incentive-compensation ban, failed to verify students' proof of graduation ("POG"), and lied to SACS to falsely retain its accreditation.

12

On July 12, 2012, the Court granted Defendants' motion to dismiss for

lack of subject matter jurisdiction.  (See Dkt. [181]; United States ex rel. Powell

v. Am. InterCont'l Univ., Inc., No. 1:08-CV-2277-RWS, 2012 WL 2885356

(N.D. Ga. July 12, 2012).)  As discussed more extensively in the Discussion,

*infra* Part II.B.2, the Court found that Relators' claims pertaining to the

incentive-compensation ban and POG requirements were barred by the first-to-

file rule because they were related to claims raised in previous *qui tam* suits.

Still, the Court permitted Relators to proceed on their SACS accreditation

claim.  Defendants now move for summary judgment on that claim.  Before

turning to the merits of the case, the Court addresses Defendants' motions to

exclude the opinions of Relators' experts.

## Discussion

## I.     Motions to Exclude Expert Opinions

### A.     Legal Standard

Federal Rule of Evidence 702 governs the admissibility of proposed

expert evidence:

> If scientific, technical, or other specialized knowledge will assist
> the trier of fact to understand the evidence or to determine a fact in
> issue, a witness qualified as an expert by knowledge, skill,

AO 72A
(Rev.8/82)

> experience, training, or education, may testify thereto in the form
> of an opinion or otherwise.

The trial court, as the gate-keeper, must determine that the testimony is "sufficiently tied to the facts of the case that it will aid the jury in resolving a factual dispute." Daubert v. Merrell Dow Pharm., 509 U.S. 579, 591 (1993) (quoting United States v. Downing, 753 F.2d 1224, 1242 (3d Cir. 1985)). The trial court must also "make certain that an expert . . . employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." Kumho Tire Co. Ltd. v. Carmichel, 526 U.S. 137, 152 (1999). The Eleventh Circuit has synthesized the existing rules into a three-part inquiry, instructing courts to consider whether: (1) the expert is qualified to testify competently regarding the matters he intends to address; (2) the methodology by which the expert reaches his conclusions is sufficiently reliable as determined by the sort of inquiry mandated in Daubert; and (3) the testimony assists the trier of fact, through the application of scientific, technical, or specialized expertise, to understand the evidence or to determine a fact in issue. City of Tuscaloosa v. Harcros Chemicals, Inc., 158 F.3d 548, 562 (11th Cir. 1998), reh'g and reh'g en banc denied, 172 F.3d 884 (1999). It is important to

note that "expert testimony that does not meet all or most of the <u>Daubert</u> factors may sometimes be admissible." <u>U.S. v. Brown</u>, 415 F.3d 1257, 1268 (11th Cir. 2005). "For nonscientific expert testimony, 'the trial judge must have considerable leeway in deciding in a particular case how to go about determining whether particular expert testimony is reliable.' A district court may decide that nonscientific expert testimony is reliable based 'upon personal knowledge or experience.' " <u>Am. Gen. Life Ins. Co. v. Schoenthal Family, LLC</u>, 555 F.3d 1331, 1338 (11th Cir. 2009) (quoting <u>Kumho Tire Co.</u>, 526 U.S. at 150, 152).

> B.  <u>Defendants' Motions to Exclude Expert Opinions of Daniel Madzelan and Martin Gonzalez, and Motion to Strike Declarations of Martin Gonzalez and Daniel Madzelan</u>

Defendants challenge Relators' experts on numerous grounds, including that neither expert is qualified under the principles set forth in <u>Daubert</u>, and that the opinions are otherwise inadmissible under Federal Rules of Evidence 403, 702, and 703. First, as a general matter, the Court finds that Dr. Gonzalez and Mr. Madzelan are qualified experts under <u>Daubert</u>. To determine if an expert can testify competently on the matters he intends to address, the Court is required "to examine the credentials of the proposed expert in light of the

15

subject matter of the proposed testimony." <u>Jack v. Glaxo Wellcome, Inc.</u>, 239

F. Supp. 2d 1308, 1314 (N.D. Ga. 2002).

Dr. Martin Gonzalez intends to testify about SACS standards, including

specific requirements in the *Principles*. He also opines that AIU was in

violation of the *Principles*, and that if SACS had known the extent of AIU's

violations, SACS would have revoked AIU's accreditation. (<u>See generally</u>

Gonzalez Report, Dkt. [397-1].) Dr. Gonzalez has held various academic

administrative positions, including as a department head, dean, campus provost,

and vice president of academic affairs. While serving as vice president of

academic affairs at Pensacola State College ("PSC"), a college with over 30,000

students, 200 full-time faculty, 600 adjunct faculty, and four campuses, Dr.

Gonzalez was responsible for ensuring that PSC met all of SACS's

accreditation requirements. (<u>Id.</u> at 18.) In doing so, he chaired PSC's College

Accreditation Committee, which met every other month and was responsible for

reviewing new SACS requirements and ensuring that PSC complied with new

and existing SACS rules. (<u>Id.</u>) Also, for the past thirty-eight years, Dr.

Gonzalez has volunteered to serve on various SACS committees, including

approximately twenty-five On-Site Reaffirmation Committees and ten

16

Compliance and Review Committees ("C&R Committees"). (Id.) Through his service on On-Site Reaffirmation Committees, Dr. Gonzalez and other members evaluated institutional compliance with SACS standards and submitted reports on their findings to the C&R Committees. (Id. at 19.) And when Dr. Gonzalez served on C&R Committees, he evaluated reaffirmation reports, compliance reports, and special committee reports, and made recommendations to the Executive Committee of SACS's Commission on Colleges for further action based on these findings. (Id.) In light of his extensive experience with SACS, Dr. Gonzalez is qualified to offer opinions on SACS accreditation standards. Defendants' objections to specific shortcomings in his experience, such as his experience with two-year schools versus four-year schools, go to the weight of his opinions and are more appropriate for cross-examination.

Daniel T. Madzelan offers opinions related to the Department of Education's recognition of accrediting bodies like SACS; the requirements academic institutions must meet to be eligible for Title IV funding; and the amount of funding AIU received. (See generally Madzelan Report, Dkt. [393-1].) Mr. Madzelan has decades of experience at the Department of Education, including service as Acting Assistant Secretary of Postsecondary Education

from 2009-2010.  (Id. at 9.)  In that position, he was the principal advisor to the Secretary of Education on higher education policy and had policy and program budget responsibility for Title IV student financial aid programs providing nearly $130 billion in grant, loan, and work-study assistance to over fourteen million postsecondary students.  (Id.)  In other positions at the DOE, Mr. Madzelan worked on policy related to Title IV financial aid programs.  (Id.)  He also worked on the reauthorization of the Higher Education Act and even provided drafting assistance to congressional staff.  (Id. at 10.)  Mr. Madzelan is thus sufficiently qualified to offer opinions on the DOE's administration of Title IV programs, the standards for accrediting bodies, and the standards institutions must meet to receive financial aid funds.  Although Mr. Madzelan was not specifically familiar with SACS's accrediting standards before this litigation, that does not disqualify him from offering opinions because his extensive knowledge of Title IV and the HEA's requirements are closely related to this topic.  Of course, Defendants could explore that issue on cross-examination.

Aside from the experts' qualifications, Defendants dispute the reliability and relevancy of their opinions.  Rather than wade through all the opinions and

18

the facts supporting those opinions contained in the expert reports, the Court will address specific opinions and Defendants' objections to them if the Court refers to them in analyzing Defendants' motions for summary judgment. Otherwise, specific objections under Federal Rules of Evidence 403, 702, and 703 may be raised at trial. For these reasons, Defendants' Motions to Exclude Expert Opinions of Daniel Madzelan and Martin Gonzalez [393, 397] are **DENIED**.

Finally, Defendants also move to exclude the affidavits of Mr. Madzelan and Dr. Gonzalez, which Relators offer in response to Defendants' motions discussed above. Those affidavits largely offer additional information about Mr. Madzelan and Dr. Gonzalez's qualifications. The affidavits do not, however, offer new opinions not disclosed in the expert reports. Therefore, as the Court has already found the experts qualified, and because the affidavits are not impermissible supplemental expert reports, Defendants' Motion to Strike the Declarations of Daniel T. Madzelan and Martin Gonzalez [421] is **DENIED**.

      C.     <u>Defendants' Motion to Strike Relators' Disclosure of Non-Retained Experts</u>

Defendants next move to strike Relators' disclosure of Drs. Tom Benberg, Carl Hite, Royce Money, Walter Harris Jr., and Ms. Chiquandra Cross as non-retained expert witnesses pursuant to Federal Rule of Civil Procedure 26(a)(2)(C). According to Relators' disclosure, "Each witness identified has testified regarding the nature and scope of the Principles of accreditation of the Southern Association of Colleges and Schools and the application of those principles to Defendants." (See Disclosure, Dkt. [400-1].) Defendants argue that Relators have failed to provide a summary of facts and opinions about which the witnesses are expected to testify in accordance with Rule 26(a)(2)(C)(ii). Relators merely list citations to excerpts of the witnesses' depositions. Moreover, Defendants assert that the expert testimony fails to satisfy Daubert and Federal Rule of Evidence 702 because most of the opinions are based on speculation. Relators counter that their non-retained experts may testify concerning hypotheticals when speaking based on "particularized knowledge that the witness has by virtue of his or her position in the business." United States v. Hill, 643 F.3d 807, 841 (11th Cir. 2011) (quoting Tampa Bay Shipbuilding & Repair Co. v. Cedar Shipping Co., 320 F.3d 1213, 1222 (11th Cir. 2003)).

In <u>Hill</u>, the representatives of victim lending institutions testified in a criminal fraud case regarding "whether the disclosure of misrepresentations in some of the fraudulent loan applications would have had any effect on their decision to approve the mortgage or loan." <u>Id.</u> at 840. The Eleventh Circuit held that such opinion testimony by a lay witness was admissible under Federal Rule of Evidence 701. <u>Id.</u> at 842. Here, Relators wish to offer opinions by non-retained experts regarding whether SACS would have approved AIU's (or a hypothetical university's) removal from probation had it known of certain fraud.

The opinions offered by the non-retained experts is problematic, however, because they do not comport with <u>Daubert</u> and Rule 702's reliability requirement. Having reviewed the proffered opinions, the Court finds that they are not "based on sufficient facts or data," nor were they formed based on "reliable principles and methods." <u>See</u> FED. R. EVID. 702(b)-(c). Unlike in <u>Hill</u>, the witnesses here do not opine on fraud in the context of discrete decisions like the approval of individual loan applications. Instead, the experts speculate how certain information might have changed their thinking, created a cause for concern, or made it more likely that they would vote to deaccredit

AIU after an extensive and collaborative committee review of AIU's conduct. The Court illustrates the unreliability of the witnesses' opinions with representative excerpts below.

Dr. Benberg, whom SACS designated to testify about the facts of AIU's accreditation, was asked numerous questions about the allegations in this case. When Dr. Benberg was asked about some of the alleged fraudulent acts, like removing white boards, Dr. Benberg was unable to recall specific details about the events, instead answering, for instance, "I just remember the issue. I don't remember details." (Benberg Depo., Dkt. [400-3] at 61.) When asked if SACS would want to know about alleged hiding of white boards, Dr. Benberg replied, "If the committee were concerned about that, then we would want to find out more information." (Id. at 64.) Relators' counsel also asked Dr. Benberg if "AIU would not be in compliance with accreditation standards if it went back to the old sales culture, correct?" (Id. at 70-71.) Dr. Benberg replied, "It likely would not if it resulted in violations of those standards that we've been talking about." (Id. at 71.)

Although at times Dr. Benberg seems to agree with Relators' counsel that AIU was in violation of SACS standards, it is unclear in those instances which facts he is assuming, or if he is making a principled guess or engaging in pure speculation. In short, Relators have not demonstrated that Dr. Benberg's opinions are based on sufficient facts or any reliable principles or methods.

Drs. Hice, Money, and Harris similarly offer shaky speculative testimony. These witnesses served on one of SACS's Compliance and Review Committees assigned to AIU from 2005 through 2007. At their depositions, the witnesses were unable to recall details about their role on the AIU committee. And when confronted with hypotheticals about whether certain information would have changed their votes to accredit AIU, the witnesses hedged. For instance, Dr. Money was asked if "[s]ome of the hypotheticals that we discussed earlier would be situations where you might be willing to vote for deaccreditation." (Money Depo., Dkt. [400-6] at 19.) Without indicating which hypothetical facts or combination of facts he was referring to, Dr. Money replied, "Yes." (Id.) In other parts of the deposition, Dr. Money made clear that he did not have enough facts to decide if individual bits of information, like the existence of certain incriminating e-mails, would have swayed his vote

AO 72A
(Rev.8/82)

against AIU:

> Q:  And when you say [the e-mail] would have affected your
> decision, would you have voted to deaccredit?
>
> . . . .
>
> The Witness:  I would have—I would have considered, along with
> the rest of the commission, other—other options.  And in this case,
> the institution appeared to be running out of options.  And so I am
> not comfortable saying that I would vote to withdraw accreditation
> without some other information that I would have.

(Id. at 23-24.)  Dr. Money also emphasized the inherently imprecise nature of

making accreditation decisions, which depend on myriad facts, interrelated

issues, and competing interests.  When Relators' counsel again asked if Dr.

Money would vote to deaccredit AIU if he could verify the authenticity of an e-

mail evidencing dishonesty, Dr. Money replied:

> In the—again, I would—since that is such a major move, I would
> want to make sure that all the facts were on the table
> and—that's—that's kind of the ultimate death of an institution in
> this environment, and so I would be very hesitant.  But in extreme
> cases, I would do it.  I've already stated that I would.
>
> . . . .
>
> . . . But it's hard for me to isolate one particular instance because
> of the human factor involved.  And so I have to realize we're
> dealing with individual and collective judgments, and we have to
> be careful and deliberate, particularly when you're dealing with the

future of an institution.

(Id. at 25-26.)  Testimony based on speculation like this is inadmissible to show

how Dr. Money would have voted.

Dr. Hite, too, was unable to offer reliable opinions based on distinct facts:

Q.  Okay. If an institution had removed the white boards for a
special committee visit and then brought them back in after the
special committee had left, why would that be a matter of concern
to you as a C&R committee member?

. . . .

A.  I guess it would concern me if they'd been up for most of the
year why all of a sudden then on a given date they came down and
happened to coincide with the date of the visit of the onsite team or
the special team.

Q.  And if they were removed specifically so that the SACS
committee members didn't see that information would that concern
you?

. . . .

A.  It would concern [me].

Q.  And why would that concern you?

A.  Well, I guess I would want to know why they were taken down
and for what purpose were they used.

Q.  Uh-huh.

AO 72A
(Rev.8/82)

> A.  And that would probably help me address of [sic] whether, you
> know, the issues that were raised related to recruitment and targets
> and that kind of thing.  If—if—I would probably have to wait to
> hear what the answer is.

(Id. at 12-13.)  Most of the rest of Dr. Hite's testimony is just as equivocal.

Because Dr. Hite's statements are not reliably grounded in fact or the application of reliable principles, his opinions are also inadmissable.

Dr. Harris's opinions fare no better.  Relators' counsel asked him the same types of hypothetical questions, and Dr. Harris offered opinions that certain information "could" amount to a "potential integrity violation," (see Harris Depo., Dkt. [400-4] at 28) some information would make it "more likely" that he would find a violation of integrity, (see id. at 18) and some hypotheticals raised issues he "would want to investigate further," (see id.). More to the point, Dr. Harris actually stated he was relying on speculation:

> Q.  And if the intent [of erasing white boards] was to prevent the
> SACS team from seeing the information [related to quotas], would
>
> that make it more or less likely for you to find that was an integrity
> violation?
>
> . . . .

26

A.  Again, this is speculative, but more likely.

(Id. at 24-25.)  Based on Dr. Harris's testimony, the Court finds that his

opinions are unreliable speculation and are not admissible.

Finally, Relators introduce testimony of Ms. Cross, a former admissions

advisor at AIU.  Ms. Cross worked at AIU from June through October 2007.

(Cross Depo., Dkt. [400-7] at 6.)  Relators fail to establish Ms. Cross's expertise

concerning SACS accreditation standards or how those standards apply to AIU,

the purpose for which Relators submit Ms. Cross's testimony.  (See Disclosure,

Dkt. [400-1].)  Nevertheless, Relators offer Ms. Cross's opinion that "if AIU

had been removed from probation by SACS, SACS wasn't paying attention."

(Cross Depo., Dkt. [400-7] at 17.)  Yet when asked to clarify her statement, Ms.

Cross explained:

> A.  That was my personal opinion that I personally didn't believe
> that the way my—my role specifically in the Admissions
> Department, that the way the—the process to get students enrolled
> in the university was a good process.  And making that statement, I
> mean that my experience from other institutions in comparison to
> my time at AIU, completely different.  And as I said before and
> said it here, that the focus was sales, and that didn't jive with me.
> And I didn't think it was a good way to run an institution of higher
> education in general.

(Id. at 17-18.)  These opinions are founded on nothing more than personal

opinion and fail to satisfy any of the requirements of <u>Daubert</u> and Rule 702.

Accordingly, Ms. Cross's expert opinions are inadmissible.

In sum, having reviewed the depositions and opinions of the proffered non-retained expert witnesses, the Court finds that the opinions are unreliable and based on inadmissible speculation. Furthermore, Ms. Cross is unqualified to testify as an expert witness about SACS's accreditation standards. For all these reasons, the Court **GRANTS** Defendants' Motion to Strike Relators' Disclosure of Non-Retained Experts [400].

## II. AIU and CEC's[1] Motions for Summary Judgment

As a preliminary matter, the Court **DENIES** Relators' Motion for Leave to File a Sur-Reply in Response to Both Defendants AIU and CEC's Reply Briefs [386]. "Neither the Federal Rules of Civil Procedure nor this Court's Local Rules authorize the filing of surreplies." <u>Fedrick v. Mercedes-Benz USA, LLC</u>, 366 F. Supp. 2d 1190, 1197 (N.D. Ga. 2005) (internal citations omitted). "To allow such surreplies as a regular practice would put the court in the

---

[1]CEC filed a separate Motion for Summary Judgment [334] asserting that Relators' claim against it fails for the additional reason that CEC was a distinct corporate entity, and did not pierce the corporate veil or use AIU as its alter ego. In light of the Court's conclusion below that Relators' FCA claim fails on the merits, the Court does not address CEC's arguments related to its corporate separateness.

position of refereeing an endless volley of briefs." <u>Garrison v. Ne. Ga. Med.</u>
<u>Ctr., Inc.</u>, 66 F. Supp. 2d 1336, 1340 (N.D. Ga. 1999) (declining to permit
surreply).  Rather, surreplies typically will be permitted by the Court only in
unusual circumstances, such as where a movant raises new arguments or facts in
a reply brief, or where a party wishes to inform the Court of a new decision or
rule implicating the motion under review.  <u>See, e.g.</u>, <u>Fedrick</u>, 366 F. Supp. 2d at
1197 (stating that "valid reason for . . . additional briefing exists . . . where the
movant raises new arguments in its reply brief").  In this case, Defendant's
reply brief directly addresses arguments raised by Relators in their response
brief, and to the extent any of Defendants' arguments assert new legal theories
or facts, the Court will not rely on those for the purpose of resolving
Defendants' motions for summary judgment.  Accordingly, a surreply is not
warranted and Relators' Motion for Leave to File a Sur-Reply [386] is
**DENIED**.


    <u>A.</u>    <u>Summary Judgment Legal Standard</u>

Federal Rule of Civil Procedure 56 requires that summary judgment be
granted "if the movant shows that there is no genuine dispute as to any material

AO 72A
(Rev.8/82)

fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). "The moving party bears 'the initial responsibility of informing the . . . court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact.' " Hickson Corp. v. N. Crossarm Co., 357 F.3d 1256, 1259 (11th Cir. 2004) (quoting Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986) (internal quotations omitted)). Where the moving party makes such a showing, the burden shifts to the non-movant, who must go beyond the pleadings and present affirmative evidence to show that a genuine issue of material fact does exist. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 257 (1986).

The applicable substantive law identifies which facts are material. Id. at 248. A fact is not material if a dispute over that fact will not affect the outcome of the suit under the governing law. Id. An issue is genuine when the evidence is such that a reasonable jury could return a verdict for the non-moving party. Id. at 249-50.

Finally, in resolving a motion for summary judgment, the court must view all evidence and draw all reasonable inferences in the light most favorable

to the non-moving party.  Patton v. Triad Guar. Ins. Corp., 277 F.3d 1294, 1296 (11th Cir. 2002).  But, the court is bound only to draw those inferences which are reasonable.  "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." Allen v. Tyson Foods, Inc., 121 F.3d 642, 646 (11th Cir. 1997) (quoting Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986)). "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted."  Anderson, 477 U.S. at 249-50 (internal citations omitted); see also Matsushita, 475 U.S. at 586 (once the moving party has met its burden under Rule 56(a), the nonmoving party "must do more than simply show there is some metaphysical doubt as to the material facts").

    B.    Analysis

    "The FCA is designed to protect the Government from fraud by imposing civil liability and penalties upon those who seek federal funds under false pretenses."  United States ex rel. Lesinski v. S. Fla. Water Mgmt. Dist., 739 F.3d 598, 600 (11th Cir. 2014).  To that end, § 3730(b)(1) of the FCA allows private-citizen plaintiffs—relators—to bring a civil action in the name of the United States to expose fraud committed by third-parties against the

31

Government.  31 U.S.C. 3730(b)(1) (2008).[2]

To succeed on a claim under the FCA, a relator must prove: "(1) a false or fraudulent claim; (2) which was presented, or caused to be presented, by the defendant to the United States for payment or approval; (3) with the knowledge that the claim was false."  United States ex rel. Walker v. R & F Props. of Lake Cnty., Inc., 433 F.3d 1349, 1355 (11th Cir. 2005).  Liability also extends to anyone who "knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the Government."  31 U.S.C. § 3729(a)(2).  Moreover, courts impose a materiality requirement for the alleged false or fraudulent claim.  See, e.g., United States ex rel. Stephens v. Tissue Sci. Labs., Inc., 664 F. Supp. 2d 1310, 1316 (N.D. Ga. 2009) (noting that "[w]hile not every circuit has adopted the materiality requirement, no circuit has rejected it outright").

Relators' overarching theory is that AIU lied to SACS to retain its accreditation and remain eligible for Title IV funds, and so because it was not

---

[2]The False Claims Act was amended in 2010. However, the Supreme Court has ruled that those amendments were not retroactive to cases which were then-currently pending.  Schindler Elevator Corp. v. United States ex. rel. Kirk, --- U.S. ---, 131 S. Ct. 1885, 1890 n.1 (2011). Thus, this Court will apply the statute as it existed at the time this suit was filed in 2008.

honestly accredited, AIU falsely submitted claims to the DOE for those funds.

The parties' arguments largely center around the appropriate theory of FCA

liability the Court should analyze. The parties also dispute whether the Court

can consider evidence that AIU lied to SACS about incentive-compensation

practices in light of the Court's earlier dismissal of Relators' incentive-

compensation fraud claim. Before the Court can decide whether AIU made a

false or fraudulent claim to the DOE, the Court must first resolve two broad

questions: first, what was the nature of AIU's certification to the Government

when it executed the PPA? And second, is the Court permitted to consider

fraud on SACS related to the incentive-compensation ban? Answering these

questions will refine the Court's ultimate examination of the merits of Relators'

FCA claim.

     *1.    What Was the Nature of AIU's Certification in the PPA?*

     In order to be eligible to receive funds under Title IV programs, an

institution of higher education must enter into a PPA with the Secretary of

Education. "The agreement shall condition the initial and continuing eligibility

of an institution to participation in a program upon compliance with [numerous

requirements] . . . ." 20 U.S.C. § 1094(a). One requirement is that "[t]he

institution will meet the requirements established by the Secretary and accrediting agencies or associations." Id. § 1094(a)(21). Federal regulations similarly state that under a PPA, an institution "will meet the requirements established pursuant to part H of Title IV of the HEA by the Secretary and nationally recognized accrediting agencies." 34 C.F.R. § 668.14(b)(23). The PPA itself, using nearly identical language, also obligates AIU to "meet the requirements established pursuant to Part H of Title IV of the HEA, by the Secretary, State [authorizing bodies], and nationally recognized accrediting agencies." (PPA, Dkt. [333-12] at 8.)

AIU states that it only certified under the 2007 PPA that it was accredited, not that it was in perfect compliance with SACS's *Principles*, and so it did not make a false representation about its accreditation to the Government. Relators, quoting United States ex rel. Hendow v. University of Phoenix, 461 F.3d 1166 (9th Cir. 2006), note that "innocent or unintentional violations do not lead to False Claims Act liability. But that is no reason to innoculate institutions of higher education from liability when they *knowingly* violate a regulatory condition, with the intent to deceive, as is alleged here." Id. at 1175. In that regard, Relators stress that even if AIU was truthful in stating that it was

34

factually accredited, it nevertheless is liable under the FCA if that accreditation was obtained through fraudulent means.

The Government advances the same argument in its Statement of Interest [408]. The Government cites <u>United States ex rel. Main v. Oakland City University</u>, 426 F.3d 914 (7th Cir. 2005), in which the Seventh Circuit explained the distinction between an "innocent" violation of a regulation and a fraudulent one resulting in liability:

> A university that accepts federal funds that are contingent on following a regulation, which it then violates, has broken a contract. But fraud requires more than breach of promise: fraud entails making a false representation, such as a statement that the speaker will do something it plans not to do. Tripping up on a regulatory complexity does not entail a knowingly false representation.

<u>Id.</u> at 917 (citation omitted).

The Government further argues:

> [T]he reach of FCA liability is unaffected by the fact that the federal government has essentially delegated some elements of oversight responsibility for a college's operations to a separate body. Put another way, the Department of Education (ED) relies upon the oversight performed by accreditors in determining a college's eligibility for Title IV funding, and a college's representation in its PPA regarding accreditation carries with it the

AO 72A
(Rev.8/82)

imprimatur that the accreditation was obtained honestly.

(Gov't's Statement of Interest, Dkt. [408] at 3.)

While the Court agrees with AIU that violating the *Principles* does not necessarily deprive an institution of Title IV funds, fraudulently obtaining or retaining accreditation might. Indeed, as the Government analogized in its Statement of Interest: "[I]f the government were to learn that a putative doctor had obtained his medical license via fraud, no one would question the government's right and ability to exclude him from receiving federal funds via the Medicare program, notwithstanding the fact that as a formal matter, he is 'licensed.' " (<u>Id.</u> at 4.) That is because the FCA is "intended to reach all types of fraud, without qualification, that might result in financial loss to the Government." <u>United States v. Neifert-White Co.</u>, 390 U.S. 228, 232 (1968).

In <u>Main</u>, for example, the Seventh Circuit confronted a *qui tam* case in the context of Title IV where a relator alleged that a university paid recruiters contingent fees to enroll students in violation of the Higher Education Act. The court explained that to receive funds under Title IV, an institution must go through several layers of paperwork: first there is an application to establish an institution's eligibility (the PPA), and second the institution and its students

36

must apply for specific grants, loans, and scholarships.  See Main, 426 F.3d at 916.  Thus, the relator alleged that the institution was not actually eligible for funds because it fraudulently represented that it was complying with the prohibition on incentive-based compensation when it applied to become eligible for Title IV funds.  Id.  The court rejected the university's argument that a false statement on an initial-eligibility application could not form the basis of an FCA claim since that application did not result in an immediate payment from the Treasury.  Id.  Even though the university's subsequent applications for funds were not fraudulent, the court explained that if fraud "is integral to a causal chain leading to payment, it is irrelevant how the federal bureaucracy has apportioned the statements among layers of paperwork."  See id.  Similarly, if here the Court finds that AIU committed fraud to retain its accreditation, then AIU's certification of accreditation in the PPA could be fraud integral to the causal chain leading to payment.

       This leads to AIU's related concern, which is that a breach of the *Principles* cannot support an FCA claim because the DOE paid AIU and other institutions despite knowing they were not in full compliance with the *Principles*.  (See AIU's Br., Dkt. [332-1] at 43-44.)  For example, AIU was

placed on probation for two years because it was not complying with the *Principles*, yet it continued to receive Title IV funds. Once again, the Court is not looking for just a breach of the *Principles*; it is looking for evidence of fraud, including misrepresentations about compliance or intentions to comply with the *Principles*. Furthermore, any false statement must satisfy a materiality requirement, and so for this additional reason, AIU cannot be liable for fraud related to noncompliance with accreditation standards if the DOE does not treat them as material.[3] To the extent the *Principles* matter, it is only to decide whether AIU knowingly made a misrepresentation so significant about compliance with SACS's *Principles* that, but for the fraud, SACS would have revoked AIU's accreditation.

> ### 2. Can Relators Rely on Evidence that AIU Hid Its Violations of the Incentive-Compensation Ban from SACS?

---

[3]It is thus apparent that the parties' argument over whether the *Principles* are conditions of participation or conditions of payment is unimportant because that answer turns on whether hiding a breach of the *Principles* was material in causing the Government to pay money. Likewise, in <u>Hendow</u> the Ninth Circuit observed that in the Title IV context the distinction between conditions of participation and payment "is a distinction without a difference." <u>See</u> 461 F.3d at 1176 (holding that relators "properly alleged the University engaged in statements or courses of conduct that were *material* to the government's decision with regard to funding" when relators "alleged that the University fraudulently violated a regulation upon which payment is expressly conditioned" (emphasis in original)).

Another fundamental dispute between the parties is whether Relators may rely on evidence that AIU hid violations of the incentive-compensation ban from SACS even though the Court dismissed Relators' incentive-compensation fraud claim. AIU asserts that Relators may not cite evidence such as concealing the use of enrollment quotas, hiding white boards tracking enrollment quotas, and cleansing admissions advisors' resumes of references to sales experience, all of which AIU says relate to incentive-compensation fraud. (<u>See</u> AIU's Br., Dkt. [332-1] at 28-29.)

The first-to-file bar states that "[w]hen a person brings an action under [the FCA], no other person than the Government may intervene or bring a related action based on facts underlying the pending action." 31 U.S.C. § 3730(b)(5). Congress intended the FCA to assist the Government in exposing fraud and recouping funds for the public fisc. <u>See</u> <u>United States ex rel. Lujan v. Hughes Aircraft Co.</u>, 243 F.3d 1181, 1187 (9th Cir. 2001) ("The first-filed claim provides the government notice of the essential facts of an alleged fraud, while the first-to-file bar stops repetitive claims."). Ultimately, once the Government has notice of potential fraud, the purposes of the FCA are vindicated. <u>United States ex rel. Branch Consultants v. Allstate Ins. Co.</u>, 560

F.3d 371, 378 (5th Cir. 2001) ("[A] relator who merely adds details to a previously exposed fraud does not help reduce fraud or return funds to the federal fisc, because once the government knows the essential facts of a fraudulent scheme, it has enough information to discover related frauds." (internal quotations omitted)).

In Branch Consultants, the Fifth Circuit summed up the "essential facts" or "material elements" standard of the first-to-file bar, which is followed by at least five other circuits: "[A]s long as the later-filed complaint alleges the same material or essential elements of fraud described in a pending *qui tam* action, § 3730(b)(5)'s jurisdictional bar applies." 560 F.3d at 378. This bar "consequently blocks other private relators from filing copycat suits that do no more than assert the same material elements of fraud, regardless of whether those later complaints are able to marshal additional factual support for their claim." Grynberg v. Koch Gateway Pipeline Co., 390 F.3d 1276, 1279 (10th Cir. 2004). "Any construction of § 3730(b)(5) that focused on the details of the later-filed action would allow an infinite number of copycat *qui tam* actions to proceed so long as the relator in each case alleged one additional instance of the previously exposed fraud." Branch Consultants, 560 F.3d at 378.

Indeed, in its July 12, 2012 Order, the Court held that Relators' claim

based on AIU's false certification of compliance with Title IV's ban on

incentive compensation was barred because it was related to similar claims

brought in previous *qui tam* actions against CEC and AIU Online.  See United

States ex rel. Powell v. Am. InterCont'l Univ., Inc., No. 1:08-CV-2277-RWS,

2012 WL 2885356, at *7-9 (N.D. Ga. July 12, 2012).  But, Relators insist that

the Court did not address AIU's fraud *on SACS* to retain accreditation, only

fraud on the DOE.  (See Relators' Resp., Dkt. [355] at 55.)  Relators argue that

this fraud is not barred because it is distinct from falsely certifying compliance

with the incentive-compensation ban in the PPA.  (Id. at 56.)

Though the Court noted in the July 12, 2012 Order that the only

remaining conduct at issue was fraud related to the SACS accreditation,[4] see

---

[4]At the time, Relators did not argue that their SACS accreditation-fraud theory
overlapped with their incentive-compensation fraud theory.  In fact, Relators did not
challenge Defendants' arguments that the factual allegations underlying the incentive-
compensation claim were pled in previous suits.  See Powell, 2012 WL 2885356, at
*6 n.5.  The particular issue before the Court in its earlier order was whether prior

Powell, 2012 WL 2885356, at *11, Relators may not bootstrap their incentive-compensation claim into a SACS accreditation-fraud claim. Doing so would draw too fine a distinction between Relators' theory of FCA liability and the kind of fraud alleged in prior *qui tam* suits. Under the FCA, Relators must show that AIU made fraudulent statements to the Government in its PPA certifications. Even if prior suits did not allege that AIU made false statements to *both* an accrediting agency and the DOE, lying to SACS about the incentive-compensation ban was just another method Defendants allegedly used to hide its noncompliance with Title IV's incentive-compensation ban from the Government. Thus, there is little difference between saying (1) the PPA was false because AIU was providing incentive compensation; and saying (2) the PPA was false because AIU was providing incentive compensation *and* was lying about the same conduct to SACS.[5]

---

suits against CEC and AIU Online barred Relators' claims against AIU. <u>See</u> <u>id.</u> at *6. The Court found that it did not matter that AIU had not been an individual defendant in those actions because other relators had alleged corporate-wide fraud at CEC encompassing AIU. <u>See</u> <u>id.</u> at *8-9. Therefore, the Court found that "Relators [had] not provided any materially different facts which would keep their claims from being related," and the Court dismissed the claims. <u>Id.</u> at *9.

[5]Relators' Complaint displays the empty distinction between fraud against SACS and fraud against the DOE regarding the same noncompliance because Relators allege that one of SACS's primary concerns was compliance with the incentive-

To illustrate, in the PPA, AIU certified both that it would comply with requirements established by SACS and that it would not provide incentive-compensation for admissions officers.  (See PPA, Dkt. [333-12] at 8.)  The SACS *Principles*, in turn, incorporate federal requirements:

> [Title IV] includes mandates that [SACS] review an institution in accordance with criteria outlined in the regulations of the [1998 Higher Education Act Amendments] developed by the U.S. Department of Education.  As part of the review process, institutions are required to document compliance with those criteria and [SACS] is obligated to consider such compliance when the institution is reviewed for initial membership or continued accreditation.

(*Principles* § 4: Federal Requirements, Dkt. [340-5] at 21.)  Under Principle 4.7, SACS must determine that AIU "is in compliance with its program responsibilities under Title IV of the 1998 Higher Education Act Amendments. (In reviewing the institution's compliance with these program responsibilities, the Commission relies on documentation forwarded to it by the U.S. Secretary of Education.)."  (Id.)  Therefore, part of SACS's job is to ensure compliance with Title IV's ban on incentive compensation.  This is consistent with the Government's delegation of higher education oversight to accrediting

---

compensation ban.  (See Compl., Dkt. [1] ¶ 36.)

associations.  Covering up incentive-compensation practices from SACS only mirrors AIU's alleged false statement to the DOE about the same conduct.  For that reason, Relators cannot prop up their FCA claim with this evidence just because conduct violating the incentive-compensation ban could also violate accreditation requirements.

Relators attempt to save their theory by arguing that the allegations in past suits do not include all the material elements of their FCA claim, but Relators misunderstand the material-elements standard.  The court in Branch Consultants noted if the "the *later-filed* complaint alleges the same material or essential elements of fraud described in a pending *qui tam* action," then the subsequent claim is barred.  560 F.3d at 378 (emphasis added).  The court warned against "focus[ing] on the details of the later-filed action," as Relators do here.  Id.  As the Court found in its July 12, 2012 Order, Relators' incentive-compensation claim is barred because Relators allege all the material elements of the same claim from previous *qui tam* actions.  While Relators' allegations further expose the widespread nature of AIU's alleged fraud, including how that fraud might have led to AIU losing its accreditation, these allegations do not expose an unrelated fraud.

AO 72A
(Rev.8/82)

Accordingly, the Court will not consider evidence related to the incentive-compensation ban, such as the use of quotas or manipulation of resumes, in assessing whether AIU lied to SACS to retain accreditation. If, by contrast, AIU materially defrauded SACS with respect to other requirements it was not meeting, and of which the Government was previously not aware, then that fraud could form the basis of an FCA claim.

### 3. Did AIU Violate the FCA?

At last, the Court examines the merits of Relators' FCA claim. To establish that AIU was fraudulently accredited, Relators offer evidence that AIU lied to SACS about (1) its use of the interest, desire, and motivation ("IDM") tool[6] and (2) compliance with the terminal-degree guideline. And as a catchall, Relators argue that AIU's lies also violated the Principle of Integrity.

Relators alleged in their Complaint that after being placed on probation, AIU "informed SACS that it would make the required changes, including utilizing the IDM checklists as part of admission, and retaining the required level of qualified faculty." (Compl., Dkt. [1] ¶ 40.) As mentioned in the

---

[6] While the IDM questionnaire is related to AIU's admissions practices, Defendants do not argue that IDM is part of Relators' incentive-compensation claim.

Background, *supra*, AIU represented in its September 2006 First Monitoring Report that it developed the IDM metric to assess prospective students. (See First Monitoring Report, Dkt. [333-1] at 56.) Relators argue that AIU abandoned its use of IDM even as it continued to represent to SACS that it used these questionnaires. (Relators' Resp., Dkt. [355] at 43-45.) AIU claims, on the other hand, that it never ceased using IDM. (See AIU's Br., Dkt. [332-1] at 24.)

Even if AIU ceased using IDM and lied to SACS about it, Relators have failed to show that SACS would have revoked AIU's accreditation but for this fraud. Relators produce no reliable evidence from which a jury could conclude that AIU's alleged lies about IDM were material to SACS's decision to lift probation. Given the numerous areas of concern SACS addressed in its Special Committee Reports, it is impossible to conclude how important IDM was considering it was only one component of AIU's response to SACS's recommendations regarding admissions. (See, e.g., 2005 Report, Dkt. 336-5] at 3 (listing ten functional areas of concern); 2006 Report, Dkt. [337-5] at 5 (noting that AIU had complied with eight of SACS's recommendations but had not complied with seven others).)

AO 72A
(Rev.8/82)

Furthermore, the expert reports of Dr. Gonzalez and Mr. Madzelan do not raise a genuine factual issue concerning materiality. These experts focused primarily on AIU's sales culture, quotas, and use of bonuses tied to enrollments. Dr. Gonzalez discussed IDM in one paragraph of his 67-page report. (See Gonzalez Report, Dkt. [397-1] at 36-37.) He opined that a single statement in an e-mail from the vice president of admissions at AIU-South Florida, which said " '[n]ot to worry about the IDM because we are not going to get visited by SACS,' " demonstrates "that AIU was not truthful in telling SACS it would use the IDMs and reflects a lack of integrity by AIU." (Id.) In his conclusion, after summarizing AIU's conduct, including integrity violations, Dr. Gonzalez stated, "Had SACS known of AIU's true conduct, SACS should have removed AIU from membership as early as 2005." (Id. at 82-83.) But in reaching his conclusion, Dr. Gonzalez focused heavily on AIU's sales culture and other evidence related to incentive compensation without mentioning IDM. Dr. Gonzalez thus provides no reliable evidence that SACS would have considered fraud related to IDM material.

Mr. Madzelan also mentioned IDM in only one paragraph of his 44-page report. (See Madzelan Report, Dkt. [393-1] at 30-31.) Like Dr. Gonzalez, Mr.

47

Madzelan focused mostly on AIU's sales culture. Then, referring to all the conduct discussed in his report, he concluded that if SACS had known of AIU's true conduct, "SACS would have been bound to rescind AIU's SACS membership or risk losing its federal recognition." (Id. at 37.) Once again, this opinion provides no evidence that IDM would have been material to SACS's accreditation decision.

Next, Relators point to AIU's failure to maintain a sufficient number of terminally degreed faculty. The evidence on this front is thin. Relators allege that an unknown faculty member was "rented" for the duration of SACS's visit. (See Relators' Resp., Dkt. [355] at 47.) Assuming this were true, Relators provide no basis to calculate whether "[a]t least 25 percent of the discipline course hours in each undergraduate major are taught by faculty members holding [a] terminal degree." (Principles § 3.7.1(d), Dkt. [333-4] at 30.) And notwithstanding the 2005 SACS Special Committee's finding that some AIU campuses lacked adequate numbers of full-time faculty, (see 2005 Report, Dkt. [336-5] at 17), only two of the eighteen recommendations listed in the 2006 Action Letter from SACS's Commission on Colleges addressed faculty issues. One recommendation concerned academic freedom; the other recommended

48

that AIU publish policies regarding faculty responsibility and authority in academic and governance matters. (See 2006 Action Letter, Dkt. [337-1] at 6.) Later, the 2007 Action Letter recommended that AIU-Los Angeles reach "an adequate number of full-time qualified faculty to support its mission." (2007 Action Letter, Dkt. [339-4] at 3.) There was no discussion of terminal degrees.

In Dr. Gonzalez's expert report, he summarized the violations of SACS's terminal-degree guidelines and stated, "If AIU represented to SACS that it was compliant in those degree programs, it would have been in violation of the Principle of Integrity, as well as [the comprehensive standards]." (Gonzalez Report, Dkt. [397-1] at 79.) But neither Relators nor Dr. Gonzalez point to any evidence that AIU lied about these deficiencies. Dr. Gonzalez referenced the alleged "renting" of a faculty member but otherwise failed to substantiate any fraud. He cited this conduct as part of his conclusion that AIU violated the Principle of Integrity and should not have been accredited. (Id. at 82-83.) But the overwhelming basis for Dr. Gonzalez's opinion is fraud related to incentive-compensation issues. Nowhere did he show that misrepresentations about faculty qualifications alone would have been important enough to revoke accreditation.

49

Mr. Madzelan drew similar conclusions based on the same evidence. (See Madzelan Report, Dkt. [393-1] at 36-37.) Mr. Madzelan went so far as to say that SACS would have revoked AIU's accreditation if it had known AIU "had no intention of retaining its terminally-degreed faculty once SACS removed AIU's probationary status." (See id. at 37.) Yet this conclusion is suspect. Mr. Madzelan roots this opinion solely in the unsupported faculty-renting theory. Mr. Madzelan does not explain why SACS would have considered this single alleged violation material, especially considering SACS never expressly made an issue of the 25% guideline. Because of the absence of evidence that AIU was defrauding SACS on this issue, Mr. Madzelan's opinion is speculative and therefore unreliable. Excluding this opinion, Relators produce no reliable evidence that AIU lied to SACS about faculty qualifications or that SACS would have revoked AIU's accreditation on this basis.

Finally, even considering the alleged fraud about IDM and faculty degrees together, Relators cannot show that these two violations plus violations of the Principle of Integrity would have resulted in deaccreditation. Because the experts' opinions are based heavily on fraud related to incentive compensation, and considering the plethora of SACS standards the Special

50

Committee Reports and Action Letters addressed, it is unclear that SACS would have considered these issues material. Even Relators' non-retained experts could not reliably conclude that this information would have changed their accreditation votes. (<u>See</u> *supra* Discussion Part I.C.) The evidence instead shows that the SACS accreditation process was a complex and even subjective inquiry. (<u>See</u> *Principles*, Dkt. [340-5] at 7 (explaining that the accreditation process "involves a collective analysis and judgment by the institution's internal constituencies, an informed review by peers external to the institution, and a reasoned decision by the elected members of the Commission on Colleges.").) A jury could do no more than speculate as to what SACS might have done had it known AIU ceased using IDM or possibly retained too few faculty with terminal degrees.

In sum, Relators fail to show that AIU fraudulently received Title IV funds by making false representations to SACS to retain its accreditation. Consequently, Defendant American Intercontinental University, Inc.'s Motion for Summary Judgment [332] and Defendant Career Education Corp.'s Motion for Summary Judgment [334] are **GRANTED**.

## Conclusion

For the foregoing reasons, Relators' Motion for Leave to File Sur-Reply [386], Defendants' Motion to Exclude Expert Opinions of Daniel Madzelan [393], Defendants' Motion to Exclude the Opinions and Testimony of Martin Gonzalez [397], and Defendants' Motion to Strike Declarations of Martin Gonzalez and Daniel Madzelan [421] are **DENIED**. In addition, Defendants' Motion to Strike Relators' Disclosure of Non-Retained Experts [400] is **GRANTED**.

Finally, Defendant American Intercontinental University, Inc.'s Motion for Summary Judgment [332] and Defendant Career Education Corp.'s Motion for Summary Judgment [334] are **GRANTED**.

**SO ORDERED**, this __29th__ day of September, 2014.

**RICHARD W. STORY**
United States District Judge

AO 72A
(Rev.8/82)