IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| *ex rel.* MELISSA SIMMS | : | |
| POWELL, *et al.*, | : | |
| | : | |
| Plaintiffs, | : | |
| | : | CIVIL ACTION NO. |
| v. | : | 1:08-CV-2277-RWS |
| | : | |
| AMERICAN | : | |
| INTERCONTINENTAL | : | |
| UNIVERSITY, INC., *et al.*, | : | |
| | : | |
| Defendants. | : | |

## ORDER

This case comes before the Court on supplemental briefing requested in

the Court's June 8, 2016 Order on issues related to Defendants' Motions for

Summary Judgment [332, 334].  After reviewing the record, the Court enters

the following Order.

### Background

This *qui tam* action under the False Claims Act ("FCA") arises out of

Defendants American Intercontinental University, Inc. ("AIU") and Career

Education Corp.'s ("CEC") alleged false statements to the government that

AIU was compliant with certain requirements under Title IV of the Higher

Education Act ("HEA").  Specifically, Relators allege that Defendants violated

the FCA when AIU executed its 2007 Program Participation Agreement

("PPA") with the Department of Education ("DOE").  In that PPA, AIU

certified that it was complying with Title IV and was accredited, but Relators

allege that these certifications were false.  They claim that, in reality, AIU was

violating the HEA's incentive compensation ban, failed to verify students'

proof of graduation ("POG"), and lied to its accreditor—the Southern

Association of Colleges and Schools ("SACS")—to falsely retain its

accreditation.  These allegations represent three separate claims: (1) incentive

compensation violations; (2) POG violations; and (3) SACS accreditation

fraud.

     Because the Court has set out this case's full factual background in

several of its previous Orders, (see Dkt. [425, 457]), it will assume familiarity

with the facts giving rise to Relators' allegations.  To the extent that the Court

must rely on additional facts in its discussion of specific motions below, it will

provide those facts in the appropriate sections.  Still, a description of this case's

procedural history is in order.

     Defendants filed a Motion for Partial Summary Judgment [115] on

August 17, 2011, arguing that three of the Relators—Powell, Plumley, and Dobson—were barred from bringing this suit because they signed broad releases of their claims. Defendants then also filed a Motion to Dismiss [124, 146], arguing that the Court lacked subject matter jurisdiction over two of the Relators' claims—incentive compensation and POG—because of the FCA's first-to-file and public disclosure bars.

The Court initially ruled on those two motions in a single Order dated July 12, 2012. First, the Court dismissed the incentive compensation and POG claims, finding that it lacked jurisdiction over them due to the first-to-file bar. The Court then denied Defendants partial summary judgment, finding that the Relators' releases were unenforceable as to the one remaining claim—SACS accreditation fraud. Because it had already dismissed the incentive compensation and POG claims under the first-to-file bar, the Court did not evaluate the release issue as to those two claims. Nor did it decide if those two claims were also barred by the public disclosure bar.

On December 16, 2013, AIU and CEC both filed Motions for Summary Judgment [332, 334] on the SACS accreditation claim. In ruling on AIU's motion, the Court found that Relators could not prop up their SACS

AO 72A
(Rev.8/82)

accreditation fraud claim with evidence that Defendants lied to SACS about AIU's compliance with the incentive compensation ban. The Court reasoned that such evidence was out of bounds because the incentive compensation claim was barred by the first-to-file bar. Without that evidence, Relators failed to generate a fact issue as to whether AIU fraudulently received Title IV funds by making false representations to SACS to retain its accreditation. Thus, the Court granted summary judgment on the SACS accreditation fraud claim. It also denied CEC's separate Motion for Summary Judgment [334] as moot.

On August 8, 2015, the Eleventh Circuit reversed the Court's dismissal of the incentive compensation and POG claims on first-to-file grounds based on intervening Supreme Court precedent. Accordingly, the Eleventh Circuit vacated the Court's July 12, 2012 Order and remanded so that the Court could consider whether the incentive compensation and POG claims were instead barred by the public disclosure bar. The Eleventh Circuit's decision also forced the Court to revisit Defendants' Motion for Partial Summary Judgment [115] because the Court was then confronted with the release issue as to the incentive compensation and POG claims.

The Court took up those issues in an Order dated June 8, 2016. The

4

Court first ruled on Defendants' Motion for Partial Summary Judgment [115], finding that Relators Powell, Plumley, and Dobson had released their POG claim, but not their incentive compensation or SACS accreditation claims. The Court then turned to Defendants' Motion to Dismiss [124] and the FCA's public disclosure bar. Importantly, the Court found that Relators Hitchens, Plumley, and Dobson were not involved in the pre-suit disclosure to the government and therefore could not serve as "original sources" under the public disclosure bar. This meant that the POG claim had to be dismissed as the only Relator to not release it—Relator Hitchens—was jurisdictionally barred from raising that claim. It also meant that only Relator Powell could serve as an original source of the incentive compensation claim. After determining that Relator Powell had direct and independent knowledge of the information on which the incentive compensation allegations were based, it found that she was indeed an original source of that claim.

Because of that finding, the Court expressed concern that it may need to vacate the portion of its September 29, 2014 Order declining to consider evidence related to the incentive compensation claim when ruling on Defendants' Motions for Summary Judgment [332, 334]. The Court noted that

5

summary judgment on the SACS accreditation claim might still be appropriate as to relators Hitchens, Plumley, and Dobson, but perhaps not as to Relator Powell.  The parties have since filed supplemental briefs addressing those issues, so they are ripe for consideration.

## Discussion

### I.   Relator Powell is an Original Source of the Incentive Compensation Claim

The first issue that the Court must take up relates to Relator Powell's status as an original source of the incentive compensation claim.  In their supplemental brief, Defendants renew their challenge to Relator Powell's original source status.  They rely exclusively on Relator Powell's testimony during her deposition, which was not taken until after Defendants filed their Motion to Dismiss [124].  They argue that Relator Powell's deposition shows that she lacked the direct and independent knowledge necessary to qualify as an original source and that the Court should therefore reconsider its ruling. Having now reviewed the cited portions of Relator Powell's deposition, the Court reaches the same conclusion as before: she is an original source of the incentive compensation claim.  As a result, that claim is not jurisdictionally

6

barred.

## II.    Defendants' Motions for Summary Judgment

With the benefit of the parties' supplemental briefing, the Court now revisits Defendants' Motions for Summary Judgment [332, 334].  The Court will lay out the relevant legal standard before addressing each motion in turn.

### A.    Summary Judgment Legal Standard

Federal Rule of Civil Procedure 56 requires that summary judgment be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  FED. R. CIV. P. 56(a).  "The moving party bears 'the initial responsibility of informing the . . . court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact.'" Hickson Corp. v. N. Crossarm Co., 357 F.3d 1256, 1260 (11th Cir. 2004) (quoting Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986) (internal quotations omitted)).  Where the moving party makes such a showing, the burden shifts to the non-movant, who must go beyond the pleadings and present affirmative evidence to show that a genuine issue of

7

material fact does exist.  <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 257 (1986).

The applicable substantive law identifies which facts are material.  <u>Id.</u> at 248.  A fact is not material if a dispute over that fact will not affect the outcome of the suit under the governing law.  <u>Id.</u>  An issue is genuine when the evidence is such that a reasonable jury could return a verdict for the non-moving party.  <u>Id.</u> at 249-50.

In resolving a motion for summary judgment, the court must view all evidence and draw all reasonable inferences in the light most favorable to the non-moving party.  <u>Patton v. Triad Guar. Ins. Corp.</u>, 277 F.3d 1294, 1296 (11th Cir. 2002).  But the court is bound only to draw those inferences that are reasonable.  "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial."  <u>Allen v. Tyson Foods, Inc.</u>, 121 F.3d 642, 646 (11th Cir. 1997) (quoting <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 587 (1986)).  "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted."  <u>Anderson</u>, 477 U.S. at 249-50 (internal citations omitted); <u>see also</u> <u>Matsushita</u>, 475 U.S. at 586 (once the moving party has met

8

its burden under Rule 56(a), the nonmoving party "must do more than simply show there is some metaphysical doubt as to the material facts").

B.      AIU's Motion for Summary Judgment [332][1]

When the Court granted summary judgment on the SACS accreditation claim, it made two central findings that bear repeating here.  First, the Court addressed Defendants' argument that AIU could not have made a false representation about its accreditation because, in executing its 2007 PPA, AIU only certified that it was accredited, not that it was in perfect compliance with SACS's *Principles of Accreditation*.  The Court rejected that argument, saying that if "the Court finds that AIU committed fraud to retain its accreditation, then AIU's certification of accreditation in the PPA could be fraud integral to the causal chain leading to payment."  (Dkt. [425] at 37.)  The Court also noted that it "is not looking for just a breach of the *Principles*; it is looking for evidence of fraud, including misrepresentations about compliance or intentions to comply with the *Principles*."  (Id. at 38.)

Second, the Court found that Relators could not rely on evidence that

---

[1] The Court incorporates the factual background laid out in its September 29, 2014 Order for purposes of discussing AIU's motion here.

AIU hid its violations of the incentive compensation ban from SACS.  (Id. at 45.)  The Court reached that conclusion because it had already dismissed Relators incentive compensation claim under the first-to-file bar.  Thus, it reasoned that "Relators may not bootstrap their incentive-compensation claim into a SACS accreditation-fraud claim" because "[d]oing so would draw too fine a distinction between Relators' theory of FCA liability and the kind of fraud alleged in prior *qui tam* suits."  (Id. at 42.)

Now that Relators' incentive compensation claim is not jurisdictionally barred, there is no reason why the Court should not consider evidence related to that claim in assessing Relators' SACS accreditation fraud claim.  Indeed, Defendants seemingly concede this point in their supplemental brief.  There, they simply rehash their argument that Relator Powell is not an original source.  Then they argue in the alternative that even if the Court considers evidence underlying the incentive compensation claim, it should have no impact on the disposition of the SACS accreditation claim.  In other words, Defendants have provided no reason why the Court should maintain its previous holding.  Accordingly, the Court **VACATES** its finding that Relators cannot rely on evidence that AIU hid violations of the incentive compensation ban from

AO 72A
(Rev.8/82)

SACS.  It now turns to that evidence to decide whether summary judgment is still appropriate.

The volume of evidence relating to AIU's alleged concealment of incentive compensation violations from SACS is substantial.  Most of it is evidence that AIU maintained an aggressive sales driven admissions culture despite representing to SACS that it had changed.[2]  Because it would be impractical for the Court to provide an exhaustive description of all of the relevant evidence, the Court will instead describe a few representative examples.

First, Relators present evidence that AIU management attempted to control admissions advisors' interactions with SACS inspectors during the Special Committee visits.  The apparent purpose of this strategy was to conceal, or at least seriously downplay, the continued role of sales tactics and

_____

[2] In their supplemental brief, Relators argue that not all evidence showing AIU's alleged fraud on SACS is related to incentive compensation ban violations.  In other words, they argue that there is a category of evidence sufficient to deny summary judgment on the SACS accreditation claim apart from any evidence that AIU hid incentive compensation ban violations from SACS.  Of course, the Court need not take up this argument because it is now declining to limit Relators' evidence.  Still, this argument is worth highlighting to clarify that fact issues remain as to the SACS accreditation claim regardless of whether the evidence discussed below shows incentive compensation ban violations or not.

AO 72A
(Rev.8/82)

quotas in the admissions departments.  For example, one former admissions

advisor stated in her affidavit:

> While I was employed by AIU, AIU prepared for an
> accreditation inspection by SACS.  As part of this
> preparation, AIU management assembled admissions
> advisors in a room and gave us a list of answers to
> provide to questions that SACS inspectors might ask.
> AIU management directed admissions advisors to
> provide these answers if asked a question by SACS
> inspectors. . . During this meeting, admissions
> advisors were specifically told by AIU management
> not to speak to SACS inspectors about AIU
> management's emphasis on the number of
> enrollments and starts generated by admissions
> advisors, including the use of quotas for enrollments
> and starts . . . AIU management told admissions
> advisors that if we could not or would not provide the
> answers desired by AIU, or if we might speak to
> SACS inspectors about quotas or the emphasis AIU
> management placed on numbers, then we were not to
> come to work on the day of the SACS inspection.

(Jenkins Aff., Dkt. [371-5] ¶¶ 8-10.)  And this is not the only testimony to that

effect.  In another affidavit, another former admissions advisor states that in

preparing for the 2006 Special Committee visit at the Buckhead campus:

> AIU management instructed admissions advisors to
> speak to SACS inspectors about AIU's focus on the
> quality, and not the quantity, of students enrolled.  I
> understood this to mean admissions advisors were not
> to speak to SACS inspectors about AIU

AO 72A
(Rev.8/82)

> management's focus on admissions advisors' number
> of enrollments and starts.

(McAfee Aff., Dkt. [371-6] ¶ 7.)  Perhaps the most damaging piece of evidence

in this regard is an email sent from the President of AIU's Houston campus

where, in talking about a "negative" admissions advisor, he says that he "will

make absolutely certain she is prepared for the SACS interviews."  (Griffin

Email, Dkt. [373-2] at 2.)  He then transitions to discussing a different

"negative" admissions advisor and her request for bereavement leave on the

dates that SACS was planning to visit the campus.  (Id.)  He says:

> Although the granting of two days for the death of a
> grandparent isn't typically permitted, I don't see any
> reason to deny her request.  That means we have 3
> positive Advisors and 3 negative Advisors who will
> be interviewed.  The positive Advisors know that this
> is their opportunity to tell the 'true' story, and they
> won't be stopped.

(Id.)  Evidence of this sort is particularly telling because it shows both an

attempt at manipulating SACS's impression of AIU and that there was internal

concern at AIU that it had something to hide.

The next example is evidence related to AIU's representation to SACS

that it had transitioned away from evaluating admissions advisors' performance

13

based solely on their number of enrollments and "starts."  One way that AIU

had supposedly accomplished this was through the use of a new "scorecard"

that ensured that admissions advisors were focused on the entire lifecycle of

the students that attended AIU.  (Gonzalez Report, Dkt. [364-3] at 43.)  In other

words, the new scorecard was supposed to hold admissions advisors

accountable not only for enrolling students, but also for retaining them.  (Id.)

But even if AIU adopted this new scorecard in form, it is not clear that it

changed anything about AIU' use of aggressive sales tactics.  Rather, there is

evidence that the purpose of the new scorecard was simply to appease SACS.

For example, former admissions advisor Charles Sumlin testified that the new

"balanced" scorecard was "only a piece of paper" or a "dead document."

(Sumlin Depo., Dkt. [370-7] at 5.)  He also said that "the focus is always on

starts and admissions and not on graduation rates and not on retention rates."

(Id. at 6.)  This was true not only in the general assessment of performance, but

in awarding promotions as well: "those individuals at the university who had

high start averages are all the ones who became [Directors of Admissions],

period."  (Id.)

　　　　Once again, this is not all of the evidence that AIU attempted to deceive

AO 72A
(Rev.8/82)

SACS.  There are plenty of other examples that could be drawn from the record.  In fact, one of the most damaging categories of evidence contains emails and other communications between AIU staff members shortly after SACS took AIU off probation.  In those communications, it is apparent that AIU was returning or intended to return to the sales-driven model that preceded its probation.  At the very least, that evidence generates an issue of fact as to AIU's truthfulness with SACS.

The final evidence that the Court will highlight is the expert report of Dr. Martin Gonzalez.  In that report, Dr. Gonzalez exhaustively reviews the record evidence that AIU deceived SACS as to its sales culture.  He then concludes by opining that "AIU clearly should not have been removed from probation in 2007.  Had SACS known of AIU's true conduct, SACS should have removed AIU from membership as early as 2005."  (Gonzalez Report, Dkt. [364-3] at 80.)  That conclusion is important because it is evidence that, but for AIU's alleged fraud, it may not have been accredited.  Thus, AIU's certification in the 2007 PPA that it was in fact accredited could have been based upon fraud.

To summarize, taken in the light most favorable to Relators, the evidence that AIU hid its sales driven admissions culture from SACS raises a genuine

dispute of material fact as to whether AIU was accredited through fraud.  That, in turn, means that "AIU's certification of accreditation in the PPA could be fraud integral to the causal chain leading to payment."  (Dkt. [425] at 37.)  For that reason, the Court **VACATES** the portion of its September 29, 2014 Order granting Defendants summary judgment on Relators' SACS accreditation claim.  Instead, AIU's Motion for Summary Judgment [332] is now **DENIED**.

C.  CEC's Motion for Summary Judgment [334]

After the Court initially granted AIU's Motion for Summary Judgment [332] and dismissed Relators' only surviving claim, it denied CEC's separate Motion for Summary Judgment [334] as moot.  But having now denied AIU's Motion, CEC's is no longer moot.  As a result, the Court now considers whether CEC is entitled to summary judgment even if AIU is not.

1.    *Factual Background*

CEC's Motion centers on establishing its corporate separateness, so the facts relevant to that Motion are those showing the relationship between CEC and AIU.  The following facts are drawn from the parties' statements of material facts and are undisputed unless otherwise noted.

American InterContinental University ("AIU-University") is owned by

16

American InterContinental University, Inc. ("AIU"),[3] a Georgia corporation.[4] (Dkt. [383-14] at 3.)  CEC is a Delaware corporation headquartered in Hoffman Estates, Illinois.  (Dkt. [334-1] ¶ 27.)  CEC acquired AIU in 2001 and thereafter AIU became a wholly-owned subsidiary of CEC.  (Dkt. [334-1] ¶ 2.) AIU's predecessor was first incorporated in Georgia in 1976 and was organized under Georgia law for the purpose of engaging in the operation of schools, colleges, and other educational facilities.  (Id. ¶ 3.)  AIU and CEC both operate under their own set of by-laws.  (Id. ¶ 4, 28.)  According to their corporate filings, from 2005 through 2008 ("relevant time period"), CEC and AIU both had principal corporate addresses in Hoffman Estates, Illinois.  (Dkt. [356-5] at 2, 5, 9, 13; Dkt. [356-6] at 3, 5, 7, 9.)  The location of AIU-University's office space, and whether it was also located in Hoffman Estates, Illinois, is in dispute.  (Dkt. [383-1] ¶ 6.)

---

[3] The Court previously established this abbreviation, and repeats it here only for clarity.

[4] While the parties make much of the distinction between American InterContinental University, Inc. and American InterContinental University, their statements of material facts are often imprecise in referring to one or the other.  The Court has done its best to name the correct entity for each fact, but there may be discrepancies where the parties were not clear.

AIU-University and CEC maintained separate bank accounts during the relevant time period.  (Dkt. [334-1] ¶ 8.)  And like other post-secondary institutions, AIU-University was assigned its own identification number with the Office of Post-Secondary Education.  (Id. ¶ 9.)

AIU has established for AIU-University a Governing Board to which it has assigned certain responsibilities.  (Id. ¶ 11.)[5]  The Governing Board is comprised of a minimum of five individuals serving staggered three year terms.  (Id. ¶ 12.)  New members are nominated and elected by the Governing Board for appointment by AIU.  (Id.)  AIU-University's Governing Board has its own set of by-laws that charge it with a wide range of tasks related to accomplishing the university's goals.  (Id. ¶ 13.)  Five individuals who served on AIU-University's Governing Board during the relevant time period also held positions at CEC.  (Id. ¶ 15.)  But during that time, the majority of AIU-University's Governing Board was comprised of individuals who had no affiliation with CEC and were not employed by CEC.  (Id. ¶ 16.)  The

---

[5] This is one example where the parties are imprecise in distinguishing between American InterContinental University and American InterContinental University, Inc. In paragraph 11 of CEC's statement of material facts, it says that "AIU, Inc." established a Governing Board.  But then in paragraph 12 it talks about the Governing Board as though it is AIU-University's.

18

Governing Board met at least four times per year.  (Id. ¶ 17.)  Minutes from each Governing Board meeting that took place are maintained by AIU-University at its offices in Atlanta.  (Id. ¶ 18.)

CEC's governing body is its Board of Directors.  (Id. ¶ 30.)  From 2005 through 2008, only one person served on AIU-University's Governing Board while also serving on CEC's Board of Directors.  (Id. ¶ 32.) AIU also has its own Board of Directors.  While AIU's Board is technically separate from CEC's, corporate filings reveal that there was a substantial amount of overlap between the members of AIU and CEC's boards from 2005 through 2008. (Dkt. [356-5]; Dkt. [356-6].)

During the relevant time period, each of AIU-University's individual campuses had its own President and multiple Vice Presidents.  (Dkt. [334-1] ¶ 21.)  None of the individuals who held these campus-specific positions were employed by CEC.  (Id.)  Instead, they all worked for AIU-University.  (Id.)

On January 1, 2005, CEC, AIU, and AIU-University entered into a "Services Agreement" whereby CEC agreed to provide certain management and administrative services requested by AIU.  (Dkt. [383-4] at 2, 7.)  This Services Agreement was replaced and superseded by the "University Services

Agreement" between CEC, AIU, and AIU-University dated April 1, 2006.

(Dkt. [383-5] at 2, 16.)  Prior to execution, the terms of both of these service

agreements were reviewed and approved by the independent members of AIU-

University's Governing Board.  (Dkt. [334-1] ¶ 24.)  All fees owed to CEC

under these services agreements were charged to AIU-University.  (Id. ¶ 25.)

On March 2, 2007, Mr. Robert Dowdell executed a PPA on behalf of

AIU-Univeristy.  (Id. ¶ 35.)  At the time Mr. Dowdell signed the PPA, he was

the President and Chief Executive Officer for CEC.  (Id. ¶ 36.)

> 2.    *Analysis*

CEC argues that it is entitled to summary judgment for two reasons.

First, AIU is its wholly owned subsidiary, and as a general rule, parent

corporations are not held liable for the actions of their subsidiaries.  See U.S. v.

Bestfoods, 524 U.S. 51, 61 (1998) ("It is a general principle of corporate law . .

. that a parent corporation (so-called because of control through ownership of

another corporation's stock) is not liable for the acts of its subsidiaries.").

Second, Relators cannot overcome CEC and AIU's corporate separateness as

the record does not contain the facts necessary to pierce the corporate veil

between them.  In response, Relators argue that summary judgment is

AO 72A
(Rev.8/82)

inappropriate because CEC is directly liable under the FCA and because there is enough evidence to pierce the corporate veil. Ultimately, the Court need not address the issue of direct liability as it finds that questions of fact remain as to AIU and CEC's corporate separateness. The Court will, therefore, focus solely on the parties' arguments related to piercing the corporate veil.

Because this is an FCA case, federal law controls the veil piercing question. See U.S. ex rel. Hockett v. Columbia/HCA Healthcare Corp., 498 F. Supp. 2d 25, 60 (D.D.C. 2007). Only in unusual circumstances will courts "disregard the separate identities of a parent and its subsidiary, even a wholly-owned subsidiary." Id. Nonetheless, the Eleventh Circuit has recognized that piercing the corporate veil is "heavily fact-specific" and therefore "peculiarly within the province of the trial court." United Steelworkers of Am. v. Connors Steel Co., 855 F.2d 1499, 1506 (11th Cir. 1988) (citations omitted). Under federal law, the question of disregarding the corporate form breaks into two questions: (1) is there such unity of interest and ownership that the separate personalities of the corporation and the individual no longer exist?; and (2) if the acts are treated as those of the corporation alone, will an inequitable result follow? Hockett, 498 F. Supp. 2d at 60; U.S. ex rel. Lawson v. Aegis

AO 72A
(Rev.8/82)

Therapies, Inc., No. CV 210-72, 2013 WL 5816501, at *4 (S.D. Ga. Oct. 29, 2013).

As for the first question, the Court finds that the record raises fact issues as to CEC and AIU's unity of interest. The most important evidence in this respect is the 2007 PPA itself. The very first page makes clear that the "Institution" that is submitting it is "American InterContinental University." (Dkt. [1-2] at 1.) Nonetheless, it is executed by Robert Dowdell as "President and Chief Executive Officer." (Id. at 16.) There is no dispute that "[a]t the time Mr. Dowdell signed this PPA, he was the President and Chief Executive Office for CEC," not AIU. (Dkt. [334-1] ¶ 36.) Because he was not an officer of AIU or AIU-University, Mr. Dowdell's execution of the PPA raises serious questions about CEC's influence and control over AIU. If CEC was truly a separate corporate personality from AIU, then one of AIU's own officers should have executed a document as important as the PPA.

In its reply, CEC argues that Mr. Dowdell's signature is not a sign that CEC controlled AIU-University because, in years past, AIU-University's PPA was signed by AIU-University's own CEO and President. (CEC's Reply Br. in Supp. of Mot. for Summ. J. ("CEC's MSJ Reply Br."), Dkt. [383] at 17.)

According to CEC, this is important because it means that AIU-University did not "need" CEC to sign its PPA to receive federal funds.  But this argument only cuts against CEC's position.  The point is not that AIU-University *needed* a CEC officer to execute its PPA, but rather that a CEC officer *did* execute its PPA.  The execution of PPAs by both officers of AIU-University itself and CEC only raises the possibility that those officers were interchangeable.

CEC also cites a few cases for the proposition that "the mere fact that a company signs an agreement 'on behalf of' a related entity is insufficient standing alone to pierce the corporate veil."  (Id. at 25.)   But those cases are easily distinguishable from this one.  For example, in Yeager, the individual that signed the agreement in question was an officer of both the parent and the subsidiary and the agreement itself indicated that the officer "was acting as the President of [the subsidiary] and not as a representative of [the parent]" when he signed the agreement.  U.S. ex rel. Yeager v. Medquest Assocs., Inc., No. 1:03-cv-00777-MHT, 2007 WL 2774340, at *4 (M.D. Ala. Sept. 24, 2007).  Not so here.  Instead, Mr. Dowdell was solely an officer of CEC, yet he signed the PPA in an area marked for AIU-University's CEO.  (Dkt. [1-2] at 16.)

Setting the 2007 PPA aside, several other issues give the Court pause

23

when considering the relationship between CEC and AIU.  First, CEC and

AIU's corporate records show a substantial overlap in the officers that served

on both corporation's boards of directions.  While Defendants are correct that

this may not be enough to make a veil piercing finding on its own, it only

strengthens the showing of a unity of interest.  Second, and more importantly,

Relators cite a host of evidence showing CEC's involvement in AIU-

University's day-to-day operations.  This includes evidence that CEC

employees were closely involved with, if not entirely in charge of: the hiring,

firing, and compensation of AIU-University admissions staff; organizing

trainings for AIU-University staff; and setting policies and productivity goals

for AIU-University admissions staff.  There is even some evidence that CEC

personnel were involved with influencing AIU-University's preparation for

SACS visits.  This level of involvement only raises questions as to AIU and

CEC's separateness.

CEC's response is that it was only involved in AIU-University's

day-to-day operations because CEC, AIU, and AIU-University had negotiated

arms-length service agreements under which CEC would provide a wide range

of services to AIU-University.  As support, CEC cites a handful of non-binding

24

cases where veil piercing claims failed because the parent corporations had entered into similar agreements with their subsidiaries.  See, e.g. Rondout Valley Cent. Sch. Dist. v. Coneco Corp., 339 F. Supp. 2d 425, 446 (N.D.N.Y. 2004).  But none of those cases state a bright-line rule that such agreements will always insulate a parent corporation from a veil piercing claim.  Indeed, a rule of that kind would make it all too easy for parent corporations to entirely evade the possibility of a veil piercing claim.  Agreements aside, the evidence shows that CEC was closely involved in a wide variety of AIU-University's daily operations.  The Court thus finds that there are genuine issues of fact as to a unity of interest and ownership between CEC and AIU.

Turning to the second question of the veil piercing inquiry—whether an inequitable result would follow from the misuse of the corporate form—the Court again finds that summary judgment is inappropriate.  CEC's own President executed AIU-University's PPA.  As a result, leaving AIU-University saddled with the baggage of any false claims contained in that PPA would indeed be inequitable.  For that reason, CEC's Motion for Summary Judgment [334] is **DENIED**.

### III.    All Four Relators May Remain in This Case

The final issue that the Court must address is whether all of the Relators may remain in this case.  Defendants urge the Court to dismiss Relators Hitchens, Plumley, and Dobson because they did not qualify as original sources of the incentive compensation claim and therefore are in the same position as when the Court initially granted summary judgment on the SACS accreditation claim.  In other words, because they are still jurisdictionally barred from pursuing the incentive compensation claim, they should not be able to rely on evidence of incentive compensation violations to prove fraud on SACS.

The Court disagrees.  Before, the incentive compensation claim was barred as to all four Relators and the Court declined to consider evidence related to that claim when evaluating the SACS accreditation claim.  That is no longer the case.  Evidence of alleged incentive compensation ban violations and concealment of those violations from SACS may now come in through Relator Powell.  That evidence generates questions of fact that a jury must decide as to the SACS accreditation claim.  Because Defendants never challenged the Court's jurisdiction over the SACS accreditation claim itself, the Court now lacks a jurisdictional basis for excluding Relators Hitchens,

26

Plumley, and Dobson from this case.  As a result, all four Relators may go to trial.

## Conclusion

As discussed above, the Court confirms its earlier finding that Relator Powell is an original source of the incentive compensation claim for purposes of defeating the public disclosure bar.  It also finds that all four Relators may remain in this case.  Finally, the Court **VACATES** the portions of its September 29, 2014 Order where it: (1) found that Relators could not rely on evidence that AIU hid its violations of the incentive compensation ban from SACS; (2) granted Defendants summary judgment on Relators' SACS accreditation claim; and (3) denied CEC's separate Motion for Summary Judgment [334] as moot.  AIU's Motion for Summary Judgment [332] is now **DENIED**.  CEC's Motion for Summary Judgment [334] is still **DENIED**, but now on the merits.  All other portions of the Court's September 29, 2014 Order remain intact.  The parties are **DIRECTED** to file their proposed consolidated pretrial order within thirty days.

**SO ORDERED**, this 20th day of September, 2016.

**RICHARD W. STORY**
United States District Judge